# VILLAGE OF BURNSVILLE AND ANOTHER v.
## CARL ONISCHUK AND OTHERS.
## CHARLES LEFEBVRE AND OTHERS, APPELLANTS.*

222 N. W. 2d 523.

September 13, 1974—Nos. 44232, 44253.

---

\* Appeal dismissed for want of a federal question, 420 U. S. 916, 95 S. Ct. 1109, 43 L. ed. 2d 388 (1975).

*Warren Spannaus*, Attorney General, *Curtis D. Forslund,* Chief Deputy Attorney General, and *Patrick Murray*, Deputy Attorney General, for appellants Lefebvre, Schneider, Notermann, and Bjornson.

*Weaver, Talle & Herrick* and *Charles R. Weaver,* for appellant Lefebvre.

*Dorsey, Marquart, Windhorst, West & Halladay, John W. Windhorst, Jr.,* and *William H. Hippee, Jr.,* for appellant Metropolitan Council.

*Grannis & Grannis, Vance B. Grannis, Vance B. Grannis, Jr.,* and *Roger N. Knutson,* for respondents.

*Gary L. Gandrud,* City Attorney, and *Robert D. Heacock, Jr.,* Assistant City Attorney, for City of Bloomington, amicus curiae.

*Allen I. Saeks, Greer E. Lockhart,* and *Earl F. Colborn, Jr.,* for Citizens League, amicus curiae.

OTIS, JUSTICE.

The issue raised by this appeal is the constitutionality of Ex. Sess. L. 1971, c. 24, Minn. St. 473F, commonly referred to as the "Metropolitan Fiscal Disparities Act." The trial court held the statute to be in violation of Minn. Const. art. 9, § 1, and we reverse.

The action was initiated as a declaratory judgment suit by the village of Burnsville, located in Dakota County, against the auditors of Dakota County, Ramsey County, Anoka County, Carver County, Scott County, and Washington County, the finance director and auditor of Hennepin County, and the state treasurer. Subsequently, Glen Northrup joined as a party plaintiff, and the Metropolitan Council intervened as a party defendant. The auditors of Dakota County, Ramsey County, Washington County, and Hennepin County, and the finance director of Hennepin County have not appealed.

In addition to the constitutional issue, the question of plaintiffs' standing is also before us.

The purposes of c. 24 are set forth in the act as follows:

Minn. St. 473F.01. "The legislature finds it desirable to improve the revenue raising and distribution system in the seven county Twin Cities area to accomplish the following objectives:

(1) To provide a way for local governments to share in the resources generated by the growth of the area, without removing any resources which local governments already have;

(2) To increase the likelihood of orderly urban development by reducing the impact of fiscal considerations on the location of business and residential growth and of highways, transit facilities and airports;

(3) To establish incentives for all parts of the area to work for the growth of the area as a whole;

(4) To provide a way whereby the area's resources can be made available within and through the existing system of local governments and local decision making;

(5) To help communities in different stages of development by making resources increasingly available to communities at those early stages of development and redevelopment when financial pressures on them are the greatest;

(6) To encourage protection of the environment by reducing the impact of fiscal considerations so that flood plains can be protected and land for parks and open space can be preserved; and

(7) To provide for the distribution to municipalities of additional revenues generated within the area or from outside sources pursuant to other legislation."

Under Minn. St. 473F.02, the area affected by the act consists of Anoka, Carver, Dakota, Hennepin, Ramsey, Scott, and Washington Counties, which includes Minneapolis and St. Paul and the suburban metropolitan municipalities immediately adjacent to them, numbering some 250 local units of government in all.

Although the formulas for achieving the purposes of the act are complex in the extreme, the stated objectives are relatively simple. In order to prevent an ill-advised competitive scramble by individual units of government within the 7-county area for commercial-industrial development to improve their tax base, the act contemplates pooling 40 percent of the increase throughout the area of all commercial-industrial valuation subsequent to January 2, 1971. For the revenue needs of each unit of government, the county auditor will thereupon impose two separate levies, one on 60 percent of the increment in its commercial-industrial valuation, if it has contributed to the pool, plus all other taxable property in that particular unit of government, and a separate levy on the metropolitan pool, representing the 40-percent increment in commercial-industrial valuation. Under this scheme, all units of government receive some distribution of the area-wide tax base although from year to year, as conditions change, some units will contribute more to the pool than will be distributed to them.[1]

The effect of the system is to reallocate the area-wide tax base thus pooled to all municipalities in direct relation to need and inverse relation to fiscal capacity. Need is measured by population, and fiscal capacity is measured by the market value of taxable property per capita.[2] Consequently, the units of government with large population and low fiscal capacity are favored in reallocation over those with small population and high fiscal capacity.[3]

The local levy of each unit of government is divided by the local tax base to determine the local mill rate which is then applied to all commercial-industrial property which has not been

[1] Defendants' exhibit 1 showing the impact of the act on individual municipalities for the year 1972 is set forth in appendix A.

[2] Minn. St. 473F.02, subd. 14, defines fiscal capacity of a municipality as "its valuation, determined as of January 2 of any year, divided by its population, determined as of a date in the same year."

[3] An example of the extremes in fiscal disparity is the per capita fiscal capacity of Circle Pines at $4,400 compared to that of Edina at $14,400.

pooled and to all other taxable property. The area-wide levies of all units of government are combined into a total levy against the area-wide tax base. The area-wide levy divided by area-wide tax base establishes an area-wide tax rate which is then applied to the value of each item of industrial-commercial property which has not been subjected to local tax rates. As previously noted, the value of commercial-industrial property to which the area-wide rate is applied varies from year to year, depending on its rate of growth in each municipality.

Since the amount a particular municipality will realize from the area-wide levy is always in direct proportion to the amount it will realize from its local tax levy, the opportunity for "raiding" the area-wide tax base is minimal or nonexistent.

When the area-wide tax levies have been collected, they are channeled through the county to the state treasurer and distributed to local units of government on the basis of the fiscal capacity of each.[4] The area-wide tax base distribution index which determines the amount of the area-wide levy to which each unit of government is entitled is computed by multiplying the population of the municipality by a fraction, the numerator of which is the average fiscal capacity of all the municipalities in the area for the preceding year, and the denominator of which is the fiscal capacity of that particular municipality, and multiplying the product by two.[5]

*Standing of plaintiffs.*

In their amended complaint, the village of Burnsville is described as a qualifying municipality under c. 24, and Northrup

---

[4] Examples of how the statute operates in a hypothetical situation are set forth in appendix B.

[5] The area-wide tax base distribution index may be illustrated thus:
Area-Wide Tax Base Distribution Index (M1) =
[Population (M1)] $\times$ $\dfrac{[\text{Average Fiscal Capacity (M)}]}{[\text{Fiscal Capacity (M1)}]} \times (2)$

Where:
M1 = any particular municipality
M = all municipalities within the metropolitan area

is described as a resident and taxpayer of Burnsville. He was also the planning director for the village. The complaint alleges that c. 24 violates the equal protection provisions of the Fourteenth Amendment and the uniformity provisions of Minn. Const. art. 9, § 1. Plaintiffs seek a declaratory judgment determining the validity of c. 24, enjoining defendants from enforcing it, and holding the statute to be unconstitutional. The trial court disposed of the question of standing by finding plaintiffs had an interest in the statute which was in jeopardy, and that "[p]ublic interest in the issues raised is of great importance to all taxpayers and governmental units affected by Chapter 24."

As to the village of Burnsville, we have difficulty understanding how the application of the statute adversely affects it. Apparently, in the first year at least, it will actually benefit from the statute. Furthermore, as far as the village itself is concerned, c. 24 will not in any way affect the amount of revenue which the village will receive but only the manner in which taxes are levied. As to the village, Commissioner of Taxation v. Crow Wing County, 275 Minn. 9, 13, 144 N. W. 2d 717, 719 (1966), governs. There, we held:

"* * * In our view the interest required to give standing to a political subdivision must be one predicated upon some adverse effect upon the governmental unit. * * * The county is not a proper party to represent the taxpayers in this situation because of its conflicting interests and duties."

In Mower County Board v. Board of Trustees of PERA, 271 Minn. 505, 513, 136 N. W. 2d 671, 676 (1965), we had this to say on the subject of county boards attacking the validity of statutes governing their duties:

"* * * To permit public officials who have no duty to interpret or administer a law endowed with the presumption of constitutionality to assail that law as an excuse for their own failure or refusal to act under a statute clearly imposing only ministerial obligations would result in chaos."

Accordingly, we hold that the village of Burnsville had no standing to attack the validity of the statute.

With the respect to the standing of Glen Northrup, a more difficult question is presented. We have held that declaratory judgment actions are not available to litigants who have other specific remedies, such as c. 278 dealing with real estate tax assessments. Land O' Lakes Dairy Co. v. Village of Sebeka, 225 Minn. 540, 547, 31 N. W. 2d 660, 664, certiorari denied, 334 U. S. 844, 68 S. Ct. 1513, 92 L. ed. 1768 (1948). See, Loew v. Hagerle Brothers, 226 Minn. 485, 488, 33 N. W. 2d 598, 600 (1948); Larson v. Freeborn County, 267 Minn. 383, 126 N. W. 2d 771 (1964). Nevertheless, we have recognized the standing of public officials who attack the constitutionality of legislation where the public interest is great. Loew v. Hagerle Brothers, *supra*; Port Authority of City of St. Paul v. Fisher, 269 Minn. 276, 292, 132 N. W. 2d 183, 194 (1964).

Although the question is a close one, we hold that Glen Northrup's status as a taxpayer and village official is sufficient to give him standing in these proceedings. Clearly, the issues here are of unusual public concern. They have been exhaustively and vigorously litigated in an adversary manner by competent counsel, and we entertain no misgivings concerning the quality of the presentation. At this stage of the litigation it would be a great disservice to the public to decline jurisdiction because the plaintiffs' standing is somewhat doubtful. Accordingly, we affirm that part of the trial court's decision which recognizes the standing of plaintiff Glen Northrup.

*The constitutionality of c. 24.*

The trial court held that c. 24 violated Minn. Const. art. 9, § 1, the pertinent provisions of which are as follows:

"* * * Taxes shall be uniform upon the same class of subjects, and shall be levied and collected for public purposes * * *."

The court did not rely on the equal protection provisions of the Fourteenth Amendment. We have construed the uniformity

clause to be no more restrictive than the equal protection clause. Reed v. Bjornson, 191 Minn. 254, 261, 253 N. W. 102, 105 (1934); Apartment Operators Assn. v. City of Minneapolis, 191 Minn. 365, 366, 254 N. W. 443 (1934); In re Taxes on Property of Cold Spring Granite Co. 271 Minn. 460, 466, 136 N. W. 2d 782, 787 (1965). The judgment permanently enjoined the enforcement of c. 24.

In arriving at its decision, the trial court made the following findings, among others:

"10. Distribution under the Act permits and contemplates the use of such funds outside the seven counties in all taxing districts partially within and partially outside the seven county area.

"11. The Act requires each taxing district within the metropolitan area to bear the burden of its own delinquent taxes.

"12. Chapter 24 does not specify nor does it establish the seven county metropolitan area as a 'taxing district.' "

The court attached to its decision the following memorandum:

"The Minnesota Supreme Court has never defined what constitutes a 'taxing district' throughout which valuation rates must be uniform. While cities, villages, towns and school districts are referred to as taxing districts in various statutes no where in Chapter 24 is the seven county metropolitan area referred to as such. Chapter 24 uses the presently existing taxing districts administrative facilities to process its procedures. It requires existing taxing districts within the area to assume the burden of their own tax delinquencies. It provides for no new additional services nor does it create new and specific obligations. It requires each taxing district affected to contribute towards the establishment of a base fund and distributes that fund on a formula having no reasonable relationship between that contribution made and the benefit derived by the segment of the population required to bear the financial burden. Its plan imposes a tax on some districts for the benefit of others. It establishes a non-uniform classification

of property within a seven county area since it does not exempt that area from its existing statewide classification.

"In general the law fails to pass the test not only of practical and common sense equality but totally fails to pass the test of constitutional uniformity requiring that the burden of a tax must fall equally and impartially upon all persons and properties subject to it."

■ Nowhere in c. 24 does the legislature expressly create a new taxing district. As plaintiffs point out, one of the purposes enunciated in the act is "[t]o provide a way whereby the area's resources can be made available within and *through the existing system of local governments* and local decision making." (Italics supplied.) Plaintiffs rely on language in Johnson v. County of Ramsey, 290 Minn. 307, 313, 187 N. W. 2d 675, 679 (1971):

"* * * Similarly, in the case before us, we believe that if the county is to be a single assessment district, this must be provided by legislative act."

The Johnson case, however, did not turn on that issue but simply decided that some disparity was justified where an entire county was being reassessed and the process could not be completed in any one taxing year.

Plaintiffs stress also the fact that a single taxing district is negated by the provisions of § 473F.08, subd. 9, which provides in part as follows:

"If the payment of any tax attributable to the area-wide tax base is delinquent, the county treasurer to whom said tax is payable shall promptly notify the state treasurer of the failure of payment. The state treasurer shall deduct the amount of the delinquency from his distributions to the county entitled to receive payment from the taxpayer."

The uniformity clause was invoked under similar circumstances in State ex rel. Smith v. Cronkhite, 28 Minn. 197, 9 N. W. 681 (1881), an opinion written by Mr. Justice Mitchell. There, the proceeds of delinquent tax sales by the county were paid to mu-

nicipalities which were not obligated to reimburse the county if the tax sale was subsequently held invalid and the county was therefore required to repay the purchaser. The court found that this burden on the county did not result in a degree of inequality which would compel a holding that the statute was unconstitutional, stating (28 Minn. 200, 9 N. W. 682):

"* * * Absolute equality is neither required nor practicable. The legislature cannot be tied down to any narrow or technical rule."

We agree with the position of defendants that the legislative policy of requiring each governmental unit to bear the loss of its own tax delinquency is simply an incentive for keeping such delinquencies to a minimum and that the municipality involved, having control of the collection process, may constitutionally be required to bear the loss.

Defendants cite Maltby v. Tautges, 50 Minn. 248, 252, 52 N. W. 858, 859 (1892), to support their contention that an area may be found to be a taxing district without the legislature expressly designating it as such. There, Mr. Justice Mitchell, again writing for the court, stated:

"The purpose to be accomplished by a tax must, of course, pertain to the district taxed. The purpose must be one which pertains in an especial manner to the district taxed, and which concerns the people of that district more particularly than it does others. Generally the nature of the case will itself conclusively fix the taxing district. For example, if the tax is to pay general state expenses, the whole state will be the taxing district. If it be to pay the general expenses of a county or city, the whole county or city, respectively, will be the taxing district. But, where the nature of the case does not conclusively fix it, the power to determine what shall be the taxing district for any particular burden is purely a legislative power, and not to be interfered with or controlled (except as it may be limited or restrained by constitutional provisions) unless in very extreme and hardly supposable

cases, where it clearly appears that the tax in no way pertains to the district taxed, and that it was imposed and apportioned without any reference whatever to any special interest on the part of such district in the purpose to be accomplished."

■ Plaintiffs stress the language in Maltby and other cases which define uniformity in terms of a "special interest" to be enjoyed by those on whom the tax burden falls. The attack on c. 24 is based on the premise that taxes can only be levied to pay for debts incurred by the taxing district having the responsibility for providing goods and services to those who bear the tax. Here, it is argued, the district simply acts as a conduit for its constituent systems of government to redistribute revenues among those units which have the burden of providing services. Plaintiffs point out that the act specifies no new responsibilities for the metropolitan area to assume. They cite a rule adopted as early as 1864 in Sanborn v. Commrs. of Rice County, 9 Minn. 258, 262 (273, 278), where we said:

"* * * [A] tax cannot be imposed exclusively on any subdivision of the state, to pay an indebtedness or claim which is not peculiarly the debt of such subdivision or to raise money for any purpose not peculiarly for the benefit of such subdivision."

In essence, the issue then is whether those units of government within the metropolitan area which in a given year contribute more of their tax base to the pool than is redistributed to them are sufficiently benefited to meet the constitutional requirement of uniformity. A number of Minnesota cases are cited by both parties for support of their positions. A brief discussion of them is in order. The Maltby case which we have quoted involved the construction by the county of a road and approach to a bridge in Burnsville, the expense of which under the statute was to be borne by adjacent communities in proportion to the benefits each realized from the project. We sustained the validity of the statutory authority for assessing individual units of government, notwithstanding the fact that the improvement was located in

only one of them. The test of uniformity there applied was the particular unit's interest in the improvement, rather than the location of the improvement.

3. Two of our decisions have held that the uniformity clause applies to distribution of revenue as well as to the levy of taxes. State ex rel. City of New Prague v. County of Scott, 195 Minn. 111, 261 N. W. 863 (1935); Village of Robbinsdale v. County of Hennepin, 199 Minn. 203, 271 N. W. 491 (1937). We are invited by defendants to reconsider and overrule those cases to the extent they hold that uniformity in distribution is required.

In New Prague, a statute was held to violate the uniformity clause where it authorized reimbursement to the city of New Prague of monies collected by Scott County for road and bridge purposes. We held it manifestly improper to relieve some taxing units of a burden imposed on others for services rendered both. The New Prague case is of little assistance to a resolution of the issues at hand since it appears to hold only that an arbitrary exemption of one unit of government receiving a benefit denies the other units, which bear the tax burden, the uniformity required by the constitution. In Hassler v. Engberg, 233 Minn. 487, 512, 48 N. W. 2d 343, 358 (1951), we said that the statute in New Prague was held unconstitutional because there was no claim of difference in conditions between that city and other municipalities which would justify differences in treatment with respect to road and bridge taxes. Robbinsdale held unconstitutional a statute which permitted municipalities other than cities of the first and second class to recover from Hennepin County 75 percent of what the municipality spent for poor relief in excess of a 1-mill tax on municipal property. The city of Minneapolis paid 92 percent of the taxes levied by the county, but was excluded from participating in the reimbursement. Robbinsdale argued that since the levy was uniform, Minn. Const. art. 9, § 1, was satisfied notwithstanding the distribution was not uniform. This distinction we rejected, citing New Prague. We concluded by saying (199 Minn. 207, 271 N. W. 493):

"* * * It is settled law in this state that where it clearly appears that the tax imposed in no way pertains to the district taxed and that it was imposed and apportioned without any reference whatsoever to any special interest on the part of such district in the purpose to be accomplished, the tax so imposed is unconstitutional as in violation of the uniformity clause."

The distribution of the tax was of special interest only to municipalities other than cities of the first and second class, who received no benefit from it but paid substantially all of the tax.

Subsequently, in City of Jackson v. County of Jackson, 214 Minn. 244, 7 N. W. 2d 753 (1943), we said that the purpose of a tax must pertain to the district taxed, that poor relief was not the obligation or concern of the county, and that to reimburse from county funds municipalities providing poor relief did not pertain to any purpose of the county, which was the district taxed. In other words, county funds could not be used to pay obligations imposed by law on its political subdivisions without violating the uniformity clause.

■ Plaintiffs argue with considerable force that these cases preclude the metropolitan area from disbursing area-wide tax revenues to individual municipalities. We agree that a literal reading of our prior opinions supports plaintiffs' position. Our decision to reverse therefore hinges on what we deem to be a developing concept of the meaning of the word "benefit." It seems to us that the phrase "special benefit" no longer adequately serves the constitutional requirement of uniformity. In a seven-county area which is heavily populated, we are of the opinion that it is no longer necessary for units of government providing tax revenue to receive the kind of tangible and specific benefits to which our court has previously referred in order to satisfy the uniformity clause. We moved away from the strict application of the "special benefits" rule in Visina v. Freeman, 252 Minn. 177, 195, 89 N. W. 2d 635, 650 (1958). There, we sustained a statutory scheme which imposed taxes in varying amounts on separate units of government which received in dif-

ferent degrees general benefits from the establishment of the Port Authority of Duluth. We there said (252 Minn. 193, 89 N. W. 2d 648):

"While the plain meaning of language used in our fundamental law may not be tampered with to accomplish a desired result no matter how archaic it has become by virtue of social and economic changes which have occurred since its adoption, neither should the proper interpretation of constitutional provisions ignore such changes. In determining whether an act of the legislature contravenes a constitutional provision we should endeavor to interpret the provision in the light of existing conditions, particularly when those conditions could not have been foreseen at the time the constitution was adopted."

In disposing of the contention that the Port Authority Act was in violation of Minn. Const. art. 9, § 1, we observed that absolute equality of taxation has never been required or attained; that there are always those who must pay taxes from which they derive no *direct* benefit; and that the legislature may constitutionally apportion taxes among those who bear the financial burden if they have a reasonable relationship to the benefits to be derived. In sustaining the tax, we pointed out that the city of Duluth would bear the greatest burden and enjoy the greatest benefits and that, in descending order, the residents of St. Louis County and of the state as a whole would benefit from increased traffic and the availability of cheaper transportation for the products exported and imported. Visina foreshadowed the decision we here reach.

■ Without unduly protracting this opinion, it is appropriate to comment on San Antonio School District v. Rodriguez, 411 U. S. 1, 93 S. Ct. 1278, 36 L. ed. 2d 16 (1973). That case, in some respects, was the converse of this. There, in a class action parents of Texas school children sought and obtained a decision of the Federal District Court holding that disparities in school expenditures which prevailed in San Antonio and elsewhere denied poor

districts equal protection of the law. The United States Supreme Court reversed. In so doing, the majority quoted the following with approval (411 U. S. 40, 93 S. Ct. 1300, 36 L. ed. 2d 47):

" 'The broad discretion as to classification possessed by a legislature in the field of taxation has long been recognized * * *. [T]he passage of time has only served to underscore the wisdom of that recognition of the large area of discretion which is needed by a legislature in formulating sound tax policies. * * * It has * * * been pointed out that in taxation, even more than in other fields, legislatures possess the greatest freedom in classification. Since the members of a legislature necessarily enjoy a familiarity with local conditions which this Court cannot have, the presumption of constitutionality can be overcome only by the most explicit demonstration that a classification is a hostile and oppressive discrimination against particular persons and classes * * *.' Madden v. Kentucky, 309 U. S. 83, 87-88 [60 S. Ct. 406, 408, 84 L. ed. 590, 593] (1940)."

The court went on to say (411 U. S. 41, 83 S. Ct. 1301, 36 L. ed. 2d 48):

"* * * No scheme of taxation, whether the tax is imposed on property, income, or purchases of goods and services, has yet been devised which is free of all discriminatory impact. In such a complex arena in which no perfect alternatives exist, the Court does well not to impose too rigorous a standard of scrutiny lest all local fiscal schemes become subjects of criticism under the Equal Protection Clause." [6]

---

[6] In a footnote, the court in referring to a proposed school-financing plan touched on an issue analogous to the one before us and stated: "* * * In simplest terms, the State would guarantee that at any particular rate of property taxation the district would receive a stated number of dollars regardless of the district's tax base. To finance the subsidies to 'poorer' districts, funds would be taken away from the 'wealthier' districts that, because of their higher property values, collect more than the stated amount at any given rate. This is not the place to weigh the arguments for and against 'district power equaliz-

Finally, in upholding the reliance of Texas school authorities on local property taxes to finance the system, the United States Supreme Court encouraged "innovative new thinking" in school funding but left the ultimate solution to lawmakers and "the democratic pressures of those who elect them." 411 U. S. 58, 59, 93 S. Ct. 1310, 36 L. ed. 2d 58.

The broad principles in the Rodriguez decision to which we have alluded are pertinent to the resolution of the fiscal disparities problems to which the Minnesota legislature addressed itself in adopting c. 24. The fiscal disparities statute is a bold and imaginative departure from conventional devices for balancing the benefits and burdens of taxation. As we have suggested, we are quick to concede that a strict application of our prior decisions would require us to lean strongly for affirmance. The trial court cannot be faulted for reading those decisions as it did. Nevertheless, we are today dealing with a viable, fluid, transient society where traditional concepts of what confers a tax benefit may be too parochial.

We find the arguments of defendants persuasive. Under existing tax practices, in order to improve their fiscal capacity, local units of government vie for commerce and industry to improve the fiscal capacity of its residents without considering the resulting impact on long-range planning and the utilization of their resources. The seven-county metropolitan area, it is pointed out, has a high degree of mobility and political, social, and economic interdependence. There is an increasing use of facilities in one municipality by those who reside or work in a different municipality. The payment of taxes in a metropolitan area may have only slight relationship to the use and enjoyment which residents make of other areas in the district. Defendants argue effectively that the indiscriminate encouragement of commerce and industry

---

ing,' beyond noting that commentators are in disagreement as to whether it is feasible, how it would work, and indeed whether it would violate the equal protection theory underlying appellees' case." 411 U. S. 42, note 85, 93 S. Ct. 1301, 36 L. ed. 2d 48.

in a particular municipality may detrimentally and irretrievably affect policies and plans for the development of parks and open spaces and frustrate well-considered housing policies for both low-income and moderate-income residences. The Fiscal Disparities Act recognizes that to some extent the location of commercial-industrial development may be irrelevant to the question of the cost of services which are added to a municipality's budget occasioned by the location of such a development within its boundaries. It should be borne in mind that all commercial-industrial property except 40 percent of its increment since January 1971 remains in the tax base for the municipality where it is located.

In other words, in terms of traditional balancing of benefits and burdens, the benefits conferred on residents of a particular municipality because of the location of commercial-industrial development within its boundaries may far exceed the burdens imposed on that municipality by virtue of the additional cost of servicing and policing the particular development which has located there. It is the theory of the Fiscal Disparities Act that the residents of highly developed commercial-industrial areas *do* enjoy direct benefits from the existence of adjacent municipalities which provide open spaces, lakes, parks, golf courses, zoos, fairgrounds, low-density housing areas, churches, schools, and hospitals.

We have concluded that the statuory scheme for revenue sharing embodied in c. 24 reaches a consitutional accommodation between the tax burdens imposed and the benefits derived therefrom to a degree which satisfies the requirements of the uniformity provisions of Minn. Const. art. 9, § 1. In reaching our decision, we echo and paraphrase what was said in Rodriguez. The legislature enjoys a familiarity with the problems of fiscal disparities which is denied the courts. The presumption of constitutionality which the statute enjoys has not been overcome by any explicit demonstration that its application results in a "hostile and oppressive discrimination" against the residents of

particular units of government. Accordingly, the judgment of the district court is reversed.

Reversed.

APPENDIX A
COMMERCIAL-INDUSTRIAL SEVEN COUNTY
METROPOLITAN AREA-WIDE TAX BASE
(40% OF COMMERCIAL-INDUSTRIAL ASSESSED
VALUATION GROWTH; 1972 OVER 1971)
40% OF COMMERCIAL-INDUSTRIAL
ASSESSED VALUATION GROWTH

| Anoka County | Contribution | Distribution | Net |
|---|---|---|---|
| Anoka | $ 104,484 | $ 391,469 | $ 286,985 |
| Bethel | 6,760 | 23,026 | 16,266 |
| Blaine (Pt) | 681,625 | 1,045,962 | 364,337 |
| Burns Twp. | 11,451 | 35,949 | 24,498 |
| Centerville | 3,019 | 23,087 | 20,068 |
| Circle Pines | 8,728 | 176,570 | 167,842 |
| Columbia Hts. | 391,550 | 749,624 | 358,074 |
| Columbia Twp. | 10,195 | 72,337 | 62,142 |
| Coon Rapids | 1,172,864 | 1,163,631 | —9,233 |
| East Bethel | 41,240 | 111,116 | 69,876 |
| Fridley | 1,912,236 | 764,414 | —1,147,822 |
| Grow Twp. | 29,290 | 176,277 | 146,987 |
| Ham Lake Twp. | 75,819 | 124,356 | 48,537 |
| Hilltop | 27,353 | 60,561 | 33,208 |
| Lexington | 11,531 | 119,951 | 108,420 |
| Lino Lakes | 201,234 | 153,959 | —47,275 |
| Linwood Twp. | 1,348 | 31,995 | 30,647 |
| Oak Grove Twp. | 5,598 | 69,628 | 64,030 |
| Ramsey Twp. | 30,622 | 109,505 | 78,883 |
| St. Francis | 16,244 | 39,219 | 22,975 |
| Spring Lake Park (Pt.) | 0 | 250,005 | 250,005 |
| Total | 4,743,191 | 5,692,641 | 949,450 |

| Carver County | Contribution | Distribution | Net |
|---|---|---|---|
| Benton | 48,442 | 15,424 | —33,018 |
| Camden Twp. | 0 | 19,353 | 19,353 |
| Carver | 3,817 | 39,390 | 35,573 |
| Chanhassen (Pt.) | 69,555 | 125,869 | 56,314 |
| Chaska | 254,694 | 181,537 | —73,157 |

| | | | |
|---|---|---|---|
| Chaska Twp. | 0 | 2,294 | 2,294 |
| Cologne | 15,352 | 22,916 | 7,564 |
| Dahlgren Twp. | 18,105 | 27,712 | 9,607 |
| Hamburg | 5,578 | 13,740 | 8,162 |
| Hancock Twp. | 258 | 6,602 | 6,344 |
| Hollywood Twp. | 0 | 25,406 | 25,406 |
| Laketown Twp. | 0 | 42,501 | 42,501 |
| Mayer | 6,615 | 16,559 | 9,944 |
| New Germany | 12,313 | 13,923 | 1,610 |
| Norwood | 17,259 | 55,216 | 37,957 |
| San Francisco Twp. | 1 | 11,336 | 11,335 |
| Victoria | 15,558 | 24,015 | 8,457 |
| Waconia | 57,972 | 85,454 | 27,482 |
| Waconia Twp. | 0 | 34,850 | 34,850 |
| Watertown | 70,371 | 70,226 | —145 |
| Watertown Twp. | 22,363 | 37,230 | 14,867 |
| Young America | 13,906 | 26,150 | 12,244 |
| Young America Twp. | 0 | 14,899 | 14,899 |
| Total | 632,159 | 912,602 | 280,443 |
| Dakota County | Contribution | Distribution | Net |
| Apple Valley | 287,847 | 303,415 | 15,586 |
| Burnsville | 0 | 417,741 | 417,741 |
| Castle Rock Twp. | 16,726 | 30,079 | 13,353 |
| Coates | 6,574 | 8,688 | 2,114 |
| Douglas Twp. | 685 | 8,237 | 7,552 |
| Eagan | 1,177,323 | 223,050 | —954,273 |
| Empire Twp. | 0 | 27,822 | 27,822 |
| Eureka Twp. | 0 | 17,218 | 17,218 |
| Farmington | 20,998 | 99,097 | 78,099 |
| Greenvale Twp. | 0 | 11,031 | 11,031 |
| Hampton | 0 | 16,364 | 16,364 |
| Hampton Twp. | 38 | 10,897 | 10,859 |
| Hastings (Pt.) | 0 | 457,399 | 457,399 |
| Inver Grove Hts. | 3,951,825 | 450,321 | —3,501,504 |
| Lakeville | 557,178 | 247,760 | —309,418 |
| Lilydale | 0 | 12,862 | 12,862 |
| Maishan Twp. | 19,879 | 30,994 | 11,115 |
| Mendota | 0 | 8,859 | 8,859 |
| Mendota Heights | 352,619 | 128,090 | —224,529 |
| Meisville | 0 | 5,577 | 5,577 |

| | | | |
|---|---:|---:|---:|
| New Tries | 0 | 15,571 | 15,571 |
| Nininger Twp. | 0 | 14,118 | 14,118 |
| Randolph | 4,010 | 20,964 | 16,954 |
| Randolph Twp. | 19,856 | 3,734 | —16,122 |
| Ravenna Twp. | 0 | 22,282 | 22,282 |
| Rosemount | 0 | 53,410 | 53,410 |
| Sciota Twp. | 0 | 2,721 | 2,721 |
| South St. Paul | 0 | 712,968 | 712,968 |
| Sunfish Lake | 133 | 3,405 | 3,272 |
| Vermillion | 0 | 15,180 | 15,180 |
| Vermillion Twp. | 10,749 | 15,705 | 4,956 |
| Waterford Twp. | 0 | 11,946 | 11,946 |
| West St. Paul | 150,811 | 505,745 | 354,934 |
| Total | 6,577,251 | 3,913,250 | —2,664,001 |
| | | | |
| Hennepin County | Contribution | Distribution | Net |
| Bloomington | 4,226,674 | 1,711,157 | —2,515,517 |
| Brooklyn Center | 717,898 | 1,046,096 | 328,198 |
| Brooklyn Park | 1,012,165 | 1,028,049 | 15,884 |
| Champlin | 31,818 | 174,191 | 142,373 |
| Chanhassen (Pt.) | 0 | 952 | 952 |
| Corcoran | 17,085 | 35,412 | 18,327 |
| Crystal | 0 | 988,110 | 988,110 |
| Dayton (Pt.) | 41,120 | 93,142 | 52,022 |
| Deephaven | 70,989 | 71,836 | 847 |
| Eden Prairie | 1,402,556 | 102,489 | —1,300,067 |
| Edina | 2,741,058 | 605,562 | —2,135,496 |
| Excelsior | 0 | 74,191 | 74,191 |
| Fort Snelling | 0 | 0 | — |
| Golden Valley | 240,372 | 408,577 | 168,205 |
| Greenfield | 6,149 | 19,439 | 13,290 |
| Greenwood | 69,035 | 9,140 | —59,895 |
| Hanover (Pt.) | 0 | 3,051 | 3,051 |
| Hassan Twp. | 1,144 | 19,134 | 17,990 |
| Hopkins | 1,645,140 | 313,470 | —1,331,670 |
| Independence | 14,006 | 40,744 | 26,738 |
| Long Lake | 120,813 | 42,684 | —78,129 |
| Loretto | 8,534 | 15,143 | 6,609 |
| Maple Grove | 288,700 | 175,399 | —113,301 |
| Maple Plain | 60,451 | 35,766 | —24,685 |
| Medicine Lake | 11,716 | 10,690 | —1,026 |

| | | | |
|---|---:|---:|---:|
| Medina | 43,049 | 52,227 | 9,178 |
| Minneapolis | 9,769,298 | 11,024,314 | 1,255,016 |
| Minnetonka | 280,886 | 878,568 | 597,682 |
| Minnetonka Beach | 0 | 7,883 | 7,883 |
| Minnetrista | 9,761 | 55,631 | 45,870 |
| Mound | 63,079 | 245,588 | 182,509 |
| New Hope | 1,401,586 | 673,688 | —727,898 |
| Orono | 65,206 | 111,836 | 46,630 |
| Osseo | 0 | 87,394 | 87,394 |
| Plymouth | 1,829,133 | 415,874 | —1,413,259 |
| Richfield | 0 | 1,311,903 | 1,311,903 |
| Robbinsdale | 177,062 | 468,161 | 291,099 |
| Rockford (Pt.) | 2,244 | 7,798 | 5,554 |
| Rogers | 75,702 | 17,193 | —58,509 |
| St. Anthony (Pt.) | 47,818 | 137,339 | 89,521 |
| St. Bonifacius | 8,086 | 28,774 | 20,688 |
| St. Louis Park | 0 | 1,008,610 | 1,008,610 |
| Shorewood | 31,372 | 93,728 | 62,356 |
| Spring Park | 330,968 | 34,863 | —296,105 |
| Tonka Bay | 0 | 28,859 | 28,859 |
| Wayzata | 0 | 57,559 | 57,559 |
| Woodland | 53 | 6,712 | 6,659 |
| Total | 26,862,726 | 23,778,926 | —3,083,800 |

| Ramsey County | Contribution | Distribution | Net |
|---|---:|---:|---:|
| Arden Hills | 143,746 | 87,394 | —56,352 |
| Blaine | 372 | 208 | —164 |
| Falcon Heights | 70,618 | 137,034 | 66,416 |
| Gem Lake | 13,545 | 2,697 | —10,848 |
| Lauderdale | 40,959 | 64,503 | 23,544 |
| Little Canada | 513,488 | 141,024 | —372,464 |
| Maplewood | 1,447,196 | 545,001 | —902,195 |
| Moundsview | 335,153 | 511,456 | 176,303 |
| New Brighton | 726,608 | 612,297 | —114,311 |
| North Oaks | 23,960 | 27,944 | 3,984 |
| North St. Paul | 353,266 | 436,630 | 83,364 |
| Roseville | 2,326,331 | 714,518 | —1,611,813 |
| St. Anthony | 208,788 | 53,740 | —155,048 |
| St. Paul | 2,706,758 | 8,335,420 | 5,628,662 |
| Shoreview | 513,744 | 358,912 | —154,832 |
| Spring Lake Park | 784 | 3,514 | 2,730 |

| | Contribution | Distribution | Net |
|---|---|---|---|
| Vadnais Heights | 156,884 | 139,438 | —17,446 |
| White Bear Lake | 91,588 | 758,910 | 667,322 |
| White Bear Twp. | 62,890 | 177,217 | 114,327 |
| Total | 9,736,678 | 13,107,857 | 3,371,179 |
| **Scott County** | **Contribution** | **Distribution** | **Net** |
| Belle Plaine | 7,300 | 81,391 | 74,091 |
| Belle Plaine Twp. | 0 | 12,007 | 12,007 |
| Blakely Twp. | 0 | 10,751 | 10,751 |
| Cedar Lake Twp | 0 | 21,769 | 21,769 |
| Credit River Twp. | 0 | 32,129 | 32,129 |
| Elko | 0 | 5,821 | 5,821 |
| Helena Twp. | 19,123 | 22,758 | 3,635 |
| Jackson | 0 | 89,335 | 89,335 |
| Jordan | 29,713 | 98,340 | 68,627 |
| Louisville Twp. | 3,015 | 12,874 | 9,859 |
| New Market | 0 | 9,213 | 9,213 |
| New Market Twp. | 0 | 29,774 | 29,774 |
| New Prague | 0 | 55,936 | 55,936 |
| Prior Lake | 96,692 | 71,800 | —24,892 |
| St. Lawrence Twp. | 3,822 | 9,359 | 5,537 |
| Sand Creek Twp. | 12,303 | 30,885 | 18,582 |
| Savage | 332,441 | 65,698 | —266,743 |
| Shakopee | 798,878 | 192,141 | —606,737 |
| Spring Lake Twp. | 25,095 | 75,046 | 49,951 |
| Total | 1,328,382 | 927,027 | —401,355 |
| **Washington County** | **Contribution** | **Distribution** | **Net** |
| Afton | 9,797 | 40,781 | 30,984 |
| Bayport | 52,485 | 94,289 | 41,804 |
| Baytown Twp. | 12,966 | 17,462 | 4,496 |
| Birchwood | 1,102 | 28,432 | 27,330 |
| Cottage Grove | 211,446 | 448,393 | 236,947 |
| Dellwood | 7,625 | 7,114 | —511 |
| Denmark Twp. | 0 | 15,851 | 15,851 |
| Forest Lake | 174,216 | 116,156 | —58,060 |
| Forest Lake Twp. | 12,605 | 90,811 | 78,206 |
| Grant Twp. | 28,243 | 43,807 | 15,564 |
| Grey Cloud Twp. | 11,331 | 10,250 | —1,081 |
| Hastings (Pt.) | 2,147 | 574 | —1,573 |
| Hugo | 104,635 | 104,746 | 111 |

| | | | |
|---|---:|---:|---:|
| Lake Elmo | 179,012 | 127,797 | —51,215 |
| Lakeland | 32,096 | 27,651 | —4,445 |
| Lake St. Croix Beach | 2,096 | 52,251 | 50,155 |
| Lakeland Shores | 1,809 | 1,306 | —503 |
| Landfall | 8,807 | 161,549 | 152,742 |
| Mahtomedi | 71,003 | 122,306 | 51,303 |
| Marine on St. Croix | 1,211 | 10,738 | 9,527 |
| May Twp. | 56,148 | 24,869 | —31,279 |
| Newport | 0 | 80,122 | 80,122 |
| New Scandia Twp. | 7,823 | 33,777 | 25,954 |
| Oakdale | 43,850 | 367,271 | 323,421 |
| Oak Park Heights | 0 | 18,304 | 18,304 |
| Pine Springs | 0 | 3,929 | 3,929 |
| St. Mary's Point | 85 | 7,527 | 7,442 |
| St. Paul Park | 99,549 | 177,315 | 77,766 |
| Stillwater | 9,222 | 367,686 | 358,464 |
| Stillwater Twp. | 0 | 20,610 | 20,610 |
| West Lakeland Twp. | 3,038 | 19,366 | 16,328 |
| White Bear Lake (Pt.) | 484 | 720 | 236 |
| Willernie | 1,191 | 37,120 | 35,929 |
| Woodbury | 145,114 | 158,340 | 13,226 |
| Total | 1,291,136 | 2,839,220 | 1,548,084 |
| Total Area Wide Tax Base | $51,171,523 | $51,171,523 | 0 |

## APPENDIX B
### STEPS IN TAX BASE SHARING

1. Determine net growth in commercial-industrial assessed valuation in each community in the metropolitan area over 1971. Take 40 percent of the result. This is the amount of assessed valuation which each community will share with the entire metropolitan area.

Example: (Edenvale Village)

1972 commercial-industrial value: $40 million

1971 commercial-industrial value:  35 million

net growth: $ 5 million

40 percent of net growth: $ 2 million

Thus, Edenvale contributes $2 million to the metropolitan pool of valuations, with the remaining $38 million of the $40 million staying local. The $2 million represents 1/20th of Edenvale's total commercial-industrial valuation. So 1/20th of every piece of commercial-industrial property in Edenvale becomes part of the metropolitan pool of valuations, and the remaining 19/20ths remains local.

2. Add together each community's contribution to the metropolitan pool of valuations to arrive at the total metropolitan pool, and then divide the metropolitan pool among all communities. (The law provides that each community's share shall be based essentially on its population except that communities with assessed valuation below the metropolitan average per capita will receive a slightly larger per capita share and those communities with above average valuation, a slightly smaller share.)

Example: Assume the metropolitan pool of valuations totals $250 million and that under the formula for sharing Edenvale is entitled to receive $3 million. Thus, Edenvale is a net gainer, contributing $2 million and receiving $3 million, for a gain of $1 million.

3. Determine each community's official assessed valuation for purposes of levying taxes. This is the sum of adding (a) all residential value, (b) all commercial-industrial value, except 40 percent of the growth, and (c) the community's share of the areawide tax base.

Example: Assume Edenvale has $60 million in residential valuation

$ 60 million residential
___

+38 million commercial-industrial, exclusive of 40 percent of the growth

$ 98 million total "local valuation"

+ 3 million (share of the metropolitan pool)
___

$101 million (total official assessed valuation)

4. Community determines the amount of dollars it wants to levy on its official assessed valuation. (In Minnesota each community certifies this dollar levy to a county official called the County Auditor.)

Example: Assume Edenvale decides to levy a tax of $5 million on its assessed valuation of $101 million.

5. The dollar tax levy is divided by the County Auditor in two parts: (a) that which will be raised on the local portion of the assessed valuation and (b) that which will be raised on the metropolitan pool of valuations. The levy is divided in the same proportion as the community's share of the metropolitan pool bears to the local valuation.

| Example: | Valuation | Dollar Levy |
|---|---|---|
| Local | $ 98 million | $4,851,500 |
| Areawide | 3 million | 148,500 |
| Total | $101 million | $5,000,000 |

6. The local levy is divided by the local valuation to arrive at the local tax rate.

$$\text{Example:} \quad \frac{\$\ 4{,}851{,}500 \text{ levy}}{\$98{,}000{,}000 \text{ valuation}} = 4.95 \text{ percent} \ (49.5 \text{ mills})$$

7. The other part of each community's levy, that is, the levy which will be raised on the metropolitan pool of valuations, is added together with the comparable levies from every other community to arrive at the total dollar levy on the metropolitan pool of valuations.

Example:

$      148,500 levy by Edenvale on the metropolitan pool
+10,000,000 total levies of all other communities on the metropolitan pool

$ 10,148,500 total levy on the metropolitan pool of valuations

8. The total levy on the metropolitan pool of valuations is divided by the total value of the metropolitan pool to arrive at the areawide tax rate.

$$\text{Example:} \quad \frac{\$\ 10{,}148{,}500 \text{ levy}}{\$250{,}000{,}000 \text{ value}} = 4.06 \text{ percent} \ (40.6 \text{ mills})$$

9. The tax rates as determined in steps 6 and 8 above are applied to each piece of property. All residential property has the tax rate as determined in step 6. For commercial-industrial property, the "local" valuation takes the rate in step 6, and the "areawide" valuation takes the rate in step 8.

Example: Returning to step 1, we see that in Edenvale 1/20th of each piece of commercial-industrial property takes the areawide rate and 19/20ths, the local rate.

KELLY, JUSTICE (concurring in part, dissenting in part).

I concur in that portion of the majority opinion holding that Glen Northrup had standing but dissent to that part of the majority opinion holding that Ex. Sess. L. 1971, c. 24, the metropolitan fiscal disparities law, satisfies the requirements of Minn. Const. art. 9, § 1, that taxes shall be uniform upon the same class of subjects.

The trial court found, contrary to defendants' assertion, that c. 24 did not establish the 7-county area as a taxing district. The legislature manifested no intent to do so. Chapter 24, as the court

noted, requires the existing taxing districts to assume the burden of their own delinquencies. The court in its memorandum went on to say:

"* * * [Chapter 24] provides for no new additional services nor does it create new and specific obligations. It requires each taxing district affected to contribute towards the establishment of a base fund and distributes that fund on a formula having no reasonable relationship between that contribution made and the benefit derived by the segment of the population required to bear the financial burden. Its plan imposes a tax on some districts for the benefit of others. It establishes a non-uniform classification of property within a seven county area since it does not exempt that area from its existing statewide classification.

"In general the law fails to pass the test not only of practical and common sense equality but totally fails to pass the test of constitutional uniformity requiring that the burden of a tax must fall equally and impartially upon all persons and properties subject to it."

Chapter 24, in any event, fails to pass the essential test of uniformity required by Minn. Const. art. 9, § 1, regardless of the status of the 7-county area as a taxing district. No useful purpose would be served in citing the cases of this court that have directly or in effect held that uniformity in distribution of benefits is required under the constitution. They are discussed in the majority opinion, which correctly states that we are invited by defendants to reconsider and overrule those cases to the extent that they hold that uniformity in distribution is required. In my view the majority opinion would effectively overrule those cases.

I concede that absolute uniformity of distribution is not required by our constitution nor by our case law. However, there should be some reasonable relationship between distribution of benefits and the taxes levied. In the present case, defendants' exhibit 1, attached to the majority opinion, shows many instances with little or no contributions by some communities which none-

theless receive substantial amounts of tax money raised in and paid for by other communities. While an argument may be made that these unequal distributions may change in the future, it isn't persuasive because in a number of instances the recipients of the benefits under c. 24 are so-called bedroom communities that have never wanted commercial-industrial property with its accompanying noise, smells, and unsightliness in spite of the tax benefits that might accrue to residents of those communities.

The defendants contend that c. 24 reduces the importance of tax base to the planning and development of municipalities, that new commercial-industrial property will be shared to some extent with other municipalities within the metropolitan area, that the race for tax base will be reduced, and the changes brought about should facilitate orderly development within the metropolitan area!

If there is anything to this contention, bedroom communities with little or no commercial-industrial property will have even less incentive for permitting its existence within their boundaries. Thus, it is difficult to conceive of any changes in conditions in the next decade or longer whereby these particular communities will contribute as much as they receive.

Nor can it be said that the distribution of area-wide taxes to these communities bears a direct relation to need. A casual observation of the homes in such areas and common knowledge of the wealth of the inhabitants of those areas make it clear that there is no need for tax relief there.

If defendants' contentions are valid in this case, why couldn't the legislature pass a law similar in all respects to c. 24 except that the valuation of residential properties rather than commercial and industrial would be the base for the area-wide tax. Presumably such a law would create an economic force by which bedroom communities would scramble for more industries. This in turn would presumably help facilitate orderly development within the metropolitan area.

What happens if some industry planning to locate on the edge

of but within the metropolitan area realizes that, because of c. 24, its taxes will be less in an adjoining county outside of the metropolitan area and builds there instead? Will c. 24 then contribute to urban sprawl and adversely affect the metropolitan area's development? In other words, isn't the claim of defendants that c. 24 will create benefits that will be enjoyed by all of the contributing communities rather nebulous and speculative?

We know from defendants' exhibit 1 that the distribution of tax money collected under c. 24 is anything but uniform. It is inconceivable that the speculative benefits suggested by defendants will be enjoyed by the communities involved in any substantially uniform degree. Thus we overrule Village of Robbinsdale v. County of Hennepin, 199 Minn. 203, 271 N. W. 491 (1937), and our other Minnesota cases holding that uniformity of distribution is required if we uphold c. 24.

It is clear that benefits to be distributed need only have a reasonable relationship to the apportionment of taxes to the various taxing districts. Thus, this court in Visina v. Freeman, 252 Minn. 177, 195, 89 N. W. 2d 635, 650 (1958), said:

"* * * If there is a reasonable relationship to the apportionment of the taxes and the benefit to be derived by that segment of our population required to bear the financial burden, it lies within the province of the legislature to make such apportionment."

Visina cannot be equated with the present case because clearly Duluth, St. Louis County, and the state would benefit from a seaway port and the taxes were apportioned on the basis of benefits to be derived. In the instant case, there is no reasonable relationship between the apportionment of taxes and money distributed to the taxing districts. The claimed benefits of an orderly development of the metropolitan area are too nebulous and speculative to be considered as having any reasonable relationship to the taxes collected and money distributed.

Chapter 24 could possibly have been structured so as to be equated with Visina in the area of distribution of benefits. If c. 24 had provided for a parks authority whereby a park or series of parks were to be established in the metropolitan area and the cost thereof was apportioned among the taxing units in accordance with the benefits to be received on some reasonable basis, there might then be uniformity in distribution of benefits. This is just one example of what might be done to accomplish some of the goals of the act. The difficulty with c. 24 as it is presented is that tax monies are distributed to various communities and placed in their general revenue funds and may be used for purposes which cannot be said to be of any benefit to other communities that do not receive as much of the area-wide tax as they contributed.

Chapter 24 should also be declared to be in violation of the uniformity clause of the Minnesota Constitution because it creates a non-uniform rate of taxation upon the same kind of taxable property throughout the metropolitan area within which the tax is to be raised. If we assume that c. 24 did establish the metropolitan area as a taxing district, as contended by defendants, the taxes raised within that district should be at a uniform rate upon the same class of property.

Under c. 24 the metro-area mill rate is applied to commercial-industrial (C-I) property. However, under Minn. St. 473F.08, subd. 6, the area-wide mill rate is applied against a percentage of C-I property, i. e., the ratio that 40 percent of the annual growth in C-I valuation in a particular subdivision since 1971 bears to its total C-I valuation. Because of the variation in growth of C-I property in each taxing unit in the metro area, the C-I property will be taxed at different rates. Thus, it is conceivable that a parcel of C-I property in one community valued at $1,000,000 may pay a tax based on a valuation of $100,000 whereas in an adjoining community a like parcel of C-I property with

a value of $1,000,000 may pay a tax on only $10,000 of its value.[1]

Defendants concede that a different proportion of the total assessed valuation of each parcel of C-I property will be subject to the area-wide tax rate in each municipality and state in their brief:

"* * * Amicus' suggestion that this differential exists is correct. The differential is an essential aspect of the mechanics of Chapter 24. If commercial-industrial tax base is to be shared among communities in proportion to increases which have occurred since 1971, the extent to which individual parcels are subject to the area-wide tax rate must vary from municipality to

---

[1] As stated in the amicus brief of the city of Bloomington, a short example reveals this nonuniform treatment within the same area-wide taxing district:

"Assumptions:

"1. The seven-county metropolitan area has been established as the taxing district.

"2. An area-wide mill rate of 300 mills.

"3. Forty percent of Community X's C-I growth since 1971 is equal to ten percent of that community's total C-I valuation.

"4. A C-I taxpayer in Community X has property valued at $1,000,000.

"5. Forty percent of Community Y's C-I growth since 1971 is equal to one percent of that community's total C-I valuation.

"6. A C-I taxpayer in Community Y has property valued at $1,000,000.

"In Community X, the 300 mill levy is applied to $100,000 of the value of that taxpayer's property. In Community Y, the 300 mill levy is applied to only $10,000 of the value of that taxpayer's property. Yet, both taxpayers reside within the same alleged metropolitan taxing district and both taxpayers' property is classified as commercial or industrial by Chapter 24. This is clearly not the uniformity in rate of taxation required by Article 9, Section 1. See Chicago and N. W. Railroad Co. v. State, 128 Wisc. 553, 108 N. W. 557, 564, where the Court said:

" 'There can be no uniform rule, which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the State, municipality, or local subdivision of the government *within which and for which the tax is to be raised.'* (Emphasis supplied.)"

municipality in the same proportions as the rates of growth in valuation vary among those municipalities."

While defendants admit that the legislature has in essence made a classification by rate, they do not agree that the classification is invalid for that reason and contend that the only question is whether the classification which the legislature has made based upon the location of property in relatively high- or low-growth municipalities is a reasonable one. Defendants then go on to contend that classification by location is reasonably related to the purpose of the statute. This concept, looked at from the standpoint of the taxpayer paying more in area-wide taxes than his competitor located in the next community with an identical facility, no doubt would seem to him to be anything but uniform. Similar statutes that might tax homeowners in one area more than those in another area simply because of location would hardly seem uniform "upon the same class of subjects."

Incidentally, one of the fringe results of c. 24 is that the greater the growth in value of C-I property the larger the percentage of the value of each piece of property used to make up the area-wide levy. This leaves a smaller portion of the value of each parcel on which to apply the local rate. Then, if that taxing unit does not receive as great a distribution as its contributions to the area-wide tax, that taxing unit will have to increase its local mill rate higher than would otherwise be necessary in order to raise the same amount of revenue. Thus, homeowners in municipalities which contribute more in metro area taxes than they receive in the distribution of those taxes will have to pay more taxes than if c. 24 were not in existence.

It is predictable that the uniformity clause of our Constitution will have little or no effect in the future decisions of this court on tax cases and that it will be easy to circumvent because the standards of Visina and City of Robbinsdale and a host of Minnesota cases will have been washed out.

PETERSON, JUSTICE (concurring in part, dissenting in part).

I concur in the opinion of Mr. Justice Kelly.

YETKA, JUSTICE (dissenting).

I join in the dissent of Justice Kelly.

I find that the legislation has four flaws which I deem fatal on a constitutional basis:

1. The legislature did not set up a new taxing district, yet the bill allows taxes to be levied on one unit of government to be expended in another.

2. The proceeds to be distributed to the recipient governmental units may be used for general governmental purposes and not for a specific project benefiting all taxpayers as was the case in Visina v. Freeman, 252 Minn. 177, 89 N. W. 2d 635 (1958), cited in the majority opinion.

3. Money grants are given to wealthy bedroom communities which not only have no financial need but whose policies have been to discourage industrial expansion in their individual communities.

4. The whole procedure of assessing and collecting the taxes is so complicated as to raise question whether administrative officials can administer the law uniformly and fairly.

It seems to me that if it was the legislative intent to encourage the development of industry in certain areas that do not have a high tax base and to help the areas which have large recreational areas, it would be proper to set up a metro tax district for the purpose of levying taxes to establish industrial parks in certain places and to aid in park and recreational area development and maintenance in others. But to levy taxes and distribute the proceeds so that a governmental unit can expend the same for general purposes seems to me not only a violation of our constitution but to actually inhibit sound fiscal management and long-range planning in those areas which have heretofore showed a lack of such planning.

MR. CHIEF JUSTICE SHERAN, not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

Mr. Justice Todd and Mr. Justice Scott took no part in the consideration or decision of this case.