FRONCEK and others, Appellants, vs. CITY OF MILWAUKEE and others, Respondents.

*February 10—March 8, 1955.*

278

For the appellants there were briefs by *Zillmer & Redford,* and oral argument by *Raymond T. Zillmer* and *William C. Dill,* all of Milwaukee.

For the respondents there was a brief by *Walter J. Mattison,* city attorney, and *Harry G. Slater,* first assistant city attorney, attorneys, and *Arthur Saltzstein,* assistant city attorney, of counsel, and oral argument by *Mr. Slater.*

FAIRCHILD, C. J.   The questions raised on this appeal are not new, and the investigation as to the competence of legislative bodies acting under the police power, in their concern for the accompanying benefit to be derived from requiring ingestion of fluoride in drinking water sold by a public utility has proceeded to the point that the properly regulated practice is found conformable with and related to public health and general welfare.  While it has been established that fluoride ingested in proper proportions to the volume of water

is especially of more immediate benefit to citizens within the age period causing them to be more susceptible to dental caries, still differences of opinion exist and have been expressed. They are set forth in the so-called Delaney's Report of the hearing of February and March, 1952, of a committee of the house of representatives of the United States and in the book entitled "Survey of the Literature of Dental Caries." However, there is a general recognition of the merit of a daily intake of fluoride of approximately 1 ppm. increasing the resistance of teeth to caries. Of course, it is recognized that there are alternatives, but the point has been reached where it can no longer be said that it is not reasonable to treat it as a proper subject for legislative act.

As in cases to which reference will be made, the city of Milwaukee, as one of its proprietary functions, operates a municipal water department, and by reason of the general control and convenience of use of the water supply it has a practical monopoly in furnishing drinking water to thousands of the residents of the city. They are served through a system of underground mains and pipes maintained by the city, and thus the city enjoys a practical monopoly of the service of water therein. The city, through the passage of various resolutions and actions taken by its officials, has determined to treat all of the water supply of the so-called city water with fluorides. It is to this procedure that the appellants object. The resolution and enactment under consideration in the fluoridation of the water supply have been put into effect. The policy is fixed, and the respondents are treating all of the water supply of so-called city water with fluorides.

The appellants earnestly, and with marked degree of thoroughness in the presentation of their views, insist that the substance of the controversy involves the welfare of a million or more people. They place great importance on their claim that there is involved "the direction in which our society shall turn in the long-term development of the

problems of the treatment of disease, for dental caries or cavities, is a disease." And they ask: "Shall it be the government, or shall it be the individual?" In their brief, appellants urge that there is a distinction between public health and private health and pointing to the differences, they say: "Contagious and infectious disease, anything that may affect others than those immediately involved, clearly involve public health. But if we have a headache from sinus, a backache from lumbago, or a toothache from caries, it is a question of private health that cannot involve anyone else." While there are several important questions that were treated with in the trial below, this contention of the appellants quite clearly defines the issue and suggests the question of the limit of the duty in a community's providing proper regulation not to extend beyond that reasonable interference which tends to preserve and promote preservation of the health of the residents. "So every police regulation must answer for its legitimacy at the bar of reasonableness." *Mehlos v. Milwaukee,* 156 Wis. 591, 599, 146 N. W. 882. In *State ex rel. Carter v. Harper,* 182 Wis. 148, 196 N. W. 451, the doctrine of legislative policy in relation to police power was set forth as follows on page 152:

" 'There must be some reasonable basis for legislative activity in respect to the matter dealt with, else the subject is outside the scope of legislative interference. However, given a subject in respect to which there is some reasonable necessity for regulation, fair doubt in respect thereto being resolved in favor of the affirmative, in case of the legislature having so determined, the degree of exigency is a matter wholly for its cognizance. What is said as regards legitimacy of subjects for exercise of the police power may be repeated as to appropriateness of means; while given the two elements, —legitimacy of subject and appropriateness of means,—the degree of interference within the boundaries of reason is for the legislature to decide, there being left in the end the judicial power to determine whether the interference goes

so far as to violate some guaranteed right,—regulate it so severely as to materially impair it, reasonable doubts being resolved in favor of legislative discretion.' "

See also *Jacobson v. Massachusetts,* 197 U. S. 11, 31, 25 Sup. Ct. 358, 49 L. Ed. 643, where Mr. Justice HARLAN said:

"If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the constitution."

There is no doubt about appellants' right to challenge the act of the common council's proceeding providing for the mixing of sodium silicofluoride, other fluoride salt, or other compounds in the water sold and delivered by the city as owner and operator of a public water utility. But the court cannot sustain that challenge. Under the material facts before the trial court, the resolution and action are reasonable. The learned trial judge was of the opinion that the issues presented upon admitted material facts are:

"Where no question of infectious or contagious disease is involved, does the city of Milwaukee possess the authority under its delegated police power to introduce fluorides in the water supply for the purpose of reducing the incidence of dental caries in children and thereby also increasing the resistance to caries in their later life and, by substantial compulsion, in the necessity of most of its inhabitants to drink such water, to compel its inhabitants to accept medication, especially where it has a beneficial effect only upon a minority, although a substantial portion of such inhabitants?"

He ruled that although a city may act in a proprietary capacity in owning and operating a water utility, the relation between the city and its inhabitants and its officers is governmental, even when the officers are performing duties which relate to the management of the city. And he said: "In the performance of its duty to promote and protect the public health, a city is not acting in a private or proprietary capacity, but purely in a governmental capacity in the discharge of one of the highest duties it owes to its citizens. *State ex rel. Martin v. Juneau,* 238 Wis. 564, 570 [300 N. W. 187]." The court recognized as controlling, evidence in the case which sustained the findings and supported the conclusion that a drinking-water supply regularly consumed between the first ten years of life containing a concentration of one ppm. of fluoride greatly inhibits dental decay, and recognized at the same time that the water supply furnished by the city was deficient in that element. While dental caries is not contagious, it is nevertheless a condition coming into existence and carrying its decaying effect to children and is generally recognized as a deteriorating element. When dental caries is recognized, as it must be, as a serious and widespread disease, a reasonably designed measure to decease or retard the incidence thereof is in the interest of the welfare of the public. It is recognized that the disease is active primarily in the formative years of child life; still the benefits derived as a result of preventing that disease carry through a substantial part of adult life.

In the case of *Chapman v. Shreveport,* 225 La. 859, 74 So. (2d) 142, 145, a case considering circumstances similar to those now before us, it was said:

"Accordingly, if fluoridation of the water supply bears any reasonable relation to the public health, it can be undertaken by the city under the express provisions of this section of its charter. Moreover, it is well settled that courts will not interfere with the legislative authority in the exercise of its

police power unless it is plain and palpable that such action has no real or substantive relation to the public health or safety or general welfare. *City of Shreveport v. Conrad,* 212 La. 737, 33 So. (2d) 503; *City of Shreveport v. Bayse,* 166 La. 689, 117 So. 775. There also exists a presumption that an ordinance adopted under the police power of the state is valid, and the burden of proving the contrary is on him who asserts the invalidity or nullity. *City of New Orleans v. Beck,* 139 La. 595, 71 So. 883, L. R. A. 1918 A, 120; *Ward v. Leche,* 189 La. 113, 179 So. 52; *State v. Saia,* 212 La. 868, 33 So. (2d) 665; *State v. Rones,* 223 La. 839; 67 So. (2d) 99.

"Although the immediate purpose of the proposed fluoridation is to retard and decrease the disease of dental caries in young children, the protection thus given will continue well into adult life. Not only will the proposed fluoridation retard and reduce this disease in the generation of children presently in Shreveport, but its effect will continue into their adult life, and consequently the proposed measure will ultimately be beneficial to all the residents of the city.

"The health of the children of a community is of vital interest and of great importance to all the inhabitants of the community. Their health and physical well-being is of great concern to all the people, and any legislation to retard or reduce disease in their midst cannot and should not be opposed on the ground that it has no reasonable relation to the general health and welfare. Children of today are adult citizens of tomorrow, upon whose shoulders will fall the responsibilities and duties of maintaining our government and society. Any legislation, therefore, which will better equip them, by retarding or reducing the prevalence of disease, is of great importance and beneficial to all citizens. In our opinion the legislation does bear a reasonable relation to public health."

We agree with the decision of the court below denying the injunction, because it is within the province of the legislative authority to enact such measures in the interest of promoting public health and welfare, even though the act to protect general health is not based strictly upon an infectious, con-

tagious, or dangerous disease. Well-reasoned precedents sustain the right of municipalities to adopt reasonable undiscriminatory measures to improve public health even though no epidemic or dangerous disease is involved. *Dowell v. Tulsa* (Okla.), 273 Pac. (2d) 859 (certiorari denied by United States supreme court, 348 U. S. 912).

It may be said, historically, that a very ugly and disfiguring dental defect results from lack of fluorides in drinking water, and we refer to an able and well-reasoned opinion by Judge ARTL of the court of common pleas of Ohio, Cayuga county, dated October 23, 1953, *Kraus v. Cleveland* (Ohio), 116 N. E. (2d) 779, 790:

"On a national scale, the United States Public Health Service began an extensive search for data that would lead to the possible discovery of a basis at which it would be safe for the ingestion of fluorides to avoid dental fluorosis, mottled enamel, without losing the benefit of fluorides' effect upon dental caries.

"The study progressed to such a degree that 'it led to the establishment in 1942 of one part per million and in 1946 of 1.5 parts per million as the maximum fluorine concentration acceptable under the requirements of the public health service drinking-water standards. So, the level of 1.5 parts per million was actually set as a safe level for water standards years before the recommendation was made that fluorides be added in optimum amounts to prevent tooth decay.' (Dr. Forsythe—Delaney Report—page 1484.)

"Public health authorities continued to study the problem, notably the New York state health department and the United States public health service, extending their studies to several controlled or pilot studies involving the addition of fluorides to nonfluoride waters in one community and comparing by various investigations the results with a near-by community whose water is fluoride free. The most notable of such experimental communities are Grand Rapids, Mich., Newburgh, N. Y., Kingston, N. Y., Bradford, Ont., Lewiston, Idaho, Evanston, Ill., Madison, Wisc., Marshall, Texas, Sheboygan, Wisc."

The objections are not based upon the claim that the program as outlined by the city will cause injury. It is rather based on a difference in policies with relation to necessity as an approach to the subject causing different standpoints.

We do not find it necessary to enter upon an extensive and detailed review of the evidence. Opinions of scientists, doctors, and dentists are given in the record. The pleadings and testimony cover hundreds of pages, including affidavits in which reference is made to certain books and pamphlets. A consideration of this evidence by the trial court discloses that a careful study has been made of the subject relating to the fluoridation of water. The sources of supply for some bodies of water contain proportions of fluoride which may be styled excessive, while others are lacking in it. Milwaukee's supply is naturally deficient. The evidence shows general health needs and warrants the assumption of proper standards placing the proposed use of fluorides within the field of legislation. We agree that many statements in the record and the exhibits are clearly conclusions. However, Judge DRECHSLER said: "There are a number of allegations and averments which present issues immaterial to the dominant and controlling issue of law as to which the facts are substantially undisputed." The essential facts pointed out so far as they are related to the form and content of the legislation are:

"The plaintiffs are purchasers and consumers of water furnished by the city, and are citizens, residents, and taxpayers of the city. They sue in behalf of themselves and other citizens, residents, taxpayers, water users, and water purchasers of the city similarly situated.

"The defendant, city of Milwaukee, is a municipal corporation of the state of Wisconsin, and the other defendants are various officers of the city, whose duties include those pertaining to the waterworks owned and operated by the city.

"On November 1, 1948, there was introduced at a meeting of the common council of the city a proposed resolution, reading as follows:

" 'Resolution to authorize the fluorination of the water supply of the city of Milwaukee for the purpose of preventing dental decay.

" 'Whereas, an overwhelming weight of scientific evidence indicates that the regular ingestion of a drinking-water supply deficient in fluorine during the first ten years of life is invariably associated with a high incidence of dental decay; and

" 'Whereas, an overwhelming weight of scientific evidence indicates that a drinking-water supply, regularly consumed during the first ten years of life, containing a concentration of one part per million of fluorine, as fluorides, greatly inhibits dental decay; and

" 'Whereas, the drinking-water supply of the city of Milwaukee is now practically devoid of fluorides; and

" 'Whereas, dental decay is rampant among children of school age, as well as people of all ages, in the city of Milwaukee; and

" 'Whereas, an addition to the drinking-water supply of the city of Milwaukee of a concentration of one part per million of fluorine, as fluorides, can, without equivocation, be expected to greatly reduce the incidence of dental decay among the citizens of Milwaukee in the future; and

" 'Whereas, the fluoride-deficient water supply of the city of Milwaukee can be safely and cheaply supplemented with a concentration of one part per million of fluorine; therefore be it

" 'Resolved, by the common council of the city of Milwaukee that the proper officials of the Milwaukee waterworks are hereby authorized and directed to provide the means and to proceed as early as possible in the year 1949 with the introduction of approximately one part of fluorine to every million parts of water distributed in the water-supply system of the city of Milwaukee; and be it further

" 'Resolved, that the cost of materials, equipment, and labor for this purpose, in the amount of approximately $100,000 per year, shall be paid for out of Milwaukee waterworks revenues.'

"This resolution was later ordered on file as a result of action taken by subsequent resolutions to be referred to; as to all of which public hearings were held before the committee to which they were referred.

"On October 24, 1950, the common council of the city adopted a resolution, signed by the mayor, reading as follows:

" 'Resolution relative to fluoridation of the city's water supply: Resolved, by the common council of the city of Milwaukee that the water department be and hereby is authorized and directed to provide the means to proceed as early as possible in the year 1951 with the fluoridation of the city's water supply, and be it: Further resolved, that the board of estimates be and hereby is authorized and directed to appropriate in the 1951 proposed budget a sufficient sum of money to carry out the aforesaid purpose.'

"Pursuant to that resolution, the city purchased equipment for fluoridating the city's public water supply at a cost of about $7,000, and purchased tons of sodium silicofluoride (hereinafter called 'fluoride') to fluoridate the water provided by the city's waterworks.

"Then on June 16, 1953, the common council of the city adopted another resolution, signed by the mayor, reading as follows:

" 'Resolution relative to commencing the introduction of sodium silicofluoride into the city water system: Whereas, pursuant to resolution file No. 48–1922A, adopted October 24, 1950, the Milwaukee waterworks has taken all steps necessary to introduce fluorine into the water it distributes, has a stock of the necessary chemicals on hand, and is prepared to commence fluoridation; now, therefore, be it resolved, by the common council of the city of Milwaukee, that the proper city officers be and they hereby are directed to commence the introduction of sodium silicofluoride into water distributed by the Milwaukee waterworks in sufficient quantities to bring the fluorine content of the water to a concentration of approximately one part per million.'

"After the second resolution became effective the city, through its waterworks, inserted fluoride into the city water to bring it to the concentration mentioned in the resolution

and continues to insert fluorides to keep it at the concentration mentioned in the resolution.

"The water is taken by the city from Lake Michigan and is distributed through a system of water mains to consumers—municipal, industrial, manufacturers of food, some of which goes into interstate commerce, and domestic, within and without the city limits. The water as taken from Lake Michigan contains less than 0.1 part of fluoride per million."

Because a public health measure has been enacted and the subject bears a real, substantial, and reasonable relation to the health of the city, there is no unreasonable invasion of the rights of the individual or of "the right of parents to bring up and care for their children as they deem best," or of any of the rights set forth by the plaintiffs in their complaint. There is then left the questions raised because of the wording of the resolution and because a resolution was used as the method to express the council's determination instead of an ordinance, and the further question of conflict with existing laws.

The resolution as such and in its form and substance provides the necessary legislative authority for the water-fluoridation plan under the police power earlier discussed in this opinion. Sec. 6.06, Milwaukee City Charter; *Meade v. Dane County,* 155 Wis. 632, 145 N. W. 239. The resolution directs the proper city officials to proceed in the matter, and this is a sufficient authorization as well as a proper fixing of responsibility upon those officials. Those officials, the proper officers, are well known. They are parties to this proceeding.

Attention is called to the misuse of the word "fluorine." However, the complete resolution discloses too clearly the legislative intention to use the word "fluoride" to permit regarding that verbal mistake as a valid objection to the validity of the act. 2 Lewis' Sutherland, Statutory Construction (2d ed.), p. 795, sec. 410. The respondent city was not intending to and did not violate the recommendation of the

state board of health. The court, in passing on this point, properly based his conclusion on the rules of statutory construction and held that the word "fluorine" as used in connection with the surrounding provisions meant "fluoride."

The objection that the resolution results in a conflict with the Federal Food, Drug, and Cosmetic Act and the State Pure Food Laws was correctly ruled out by the circuit court. The city attorney asserts that when the action of the common council is considered in the light of information concerning the many communities fluoridating their water, it is apparent that the legislative body (the common council) is not pioneering in a field of medicine or health which is new and unusual. *Cantwell v. Connecticut,* 310 U. S. 296, 60 Sup. Ct. 900, 84 L. Ed. 1213. Upon the trial below, attention was called to an opinion of the attorney general, 42 Op. Atty. Gen. 160, dated June 9, 1953, containing a discussion of the points now being considered. In that opinion sec. 97.27, Stats., appears, which reads:

"97.27 (1) No person, firm, or corporation shall, by himself, or by his agents or servants, manufacture, sell, ship, consign, offer for sale, expose for sale, or have in his possession with intent to sell for use or consumption within the state, any article of food within the meaning of section 97.01, which contains . . . fluorides, fluoborates, fluosilicates, or other fluorine compounds, or any other preservatives injurious to health; . . ."

In his opinion, the attorney general said (p. 162):

"Your problem really divides itself into two phases, whether this section precludes a municipality from fluoridating its water supply, and whether the section prohibits a food manufacturer from utilizing fluoridated water from the municipal system in preparing foods for sale.
"Sec. 97.27 (1) relates to foods, but by definition sec. 97.01, Stats., provides that the term 'food' as used in ch. 97 includes all articles used for *food or drink* or condiment by man, whether simple, mixed, or compound, and all articles

used or intended for use as ingredients in the composition or preparation thereof.

"That the provisions of sec. 97.27 (1) were not intended to apply to municipal water supplies is clearly evidenced, however, by other and later provisions of the statutes.

"Sec. 196.03 (3), Stats., relating to the fixing of utility rates by the public service commission, provides:

" 'In the case of a public water utility, the commission shall include, in the determination of water rates, the cost of *fluorinating* the water in the area served by such public water utility, provided the local governing legislative body in which such public water utility is situated authorizes the *fluorination* of water in the area primarily served by such public water utility.'

"Sec. 66.069 (1) (a), Stats., provides in part:

" 'The council or board of any town, village, or city operating a public utility may, by ordinance, fix the initial rates and provide for this collection monthly, quarterly, or semiannually in advance or otherwise. The rates shall be uniform for like service in all parts of the municipality and shall include the cost of *fluorinating* the water.'

"Sec. 66.071 (1) (f), Stats., relating to the city of Milwaukee, provides in the part governing charges for the furnishing of water to users outside the city:

" '. . . which charges shall include the proportionate cost of *fluorinating* the water.'

"This clearly implies that city of Milwaukee may fluoridate its water supply. It might also be added that waterworks maintenance and operation plans are subject to approval by the state board of health under sec. 144.04, Stats., and that the state board of health has approved the plans and specifications submitted by the city of Milwaukee in connection with the installation of its fluoridation equipment.

"This brings us to the second part of your question relating to the impact, if any, of sec. 97.27 (1) upon the food processor or manufacturer who utilizes fluoridated water from a municipal water system in the course of his operations.

"Again it is our conclusion that sec. 97.27 (1) was not intended to apply.

"Perhaps the most comprehensive study of fluoridation of water supplies available is that published by the National

Institute of Municipal Law Officers, Report No. 140, 1952, entitled Fluoridation of Municipal Water Supply—A Review of the Scientific and Legal Aspects, by Charles S. Rhyne and Eugene F. Mullin, Jr."

The attorney general supports his opinion by calling attention to the case of *United States v. Commonwealth Brewing Co.,* notice of judgment No. 7926, reported in the March, 1946, issue of Notices of Judgment under Federal Food, Drug, and Cosmetic Act. It may also be found in Kleinfeld & Dunn, Federal Food, Drug, and Cosmetic Act, 1938–1949, published by Commerce Clearing House, Inc., at page 310. It was there held that the federal act does not proscribe fluoridation of municipal water supplies.

The attorney general's opinion then reads (p. 164) :

"In the July 23, 1952, Federal Register, 6732, there is printed a statement by John L. Thurston, acting federal security administrator, under the date of July 17, 1952, which statement reads in part as follows :

" '(c) The federal security agency will regard water supplies containing fluorine, within the limitations recommended by the public health service, as not actionable under the Federal Food, Drug, and Cosmetic Act. Similarly, commercially prepared foods within the jurisdiction of the act, in which a fluoridated water supply has been used in the processing operation, will not be regarded as actionable under the federal law because of the fluorine content of the water so used, unless the process involves a significant concentration of fluorine from the water. In the latter instance the facts with respect to the particular case will be controlling. (Sec. 701, 52 Stat. 1055; 21 U. S. C. 371.)' See p. 47, Fluoridation of Municipal Water Supply, *supra.*

"While the federal act is couched in more general language than sec. 97.27 (1), Stats., and mentions 'poisonous or deleterious substances' rather than specific ingredients such as fluorine, it was considered in the *Commonwealth Case* to include fluorine in shipments of food in interstate commerce and we believe the reasoning of the federal security administrator is equally applicable to sec. 97.27 (1), Stats. . . .

"Sec. 97.27 (1) had its genesis in ch. 33, Laws 1905. It reads now substantially the same as it did then. This was long before the fluoridation of municipal water supplies, which is a very recent development, having been commenced at Grand Rapids, Michigan, in January, 1945. See Fluoridation of Municipal Water Supply, *supra,* at p. 6. On the other hand, secs. 66.069 (1) (a), 66.071 (1) (f) and 196.03 (3), Stats., in so far as they relate to fluoridation of city water supplies, had their origin in chs. 325, 327, and 328, respectively, Laws 1949. Presumably the legislature was aware of the existence of sec. 97.27(1) when it enacted these later provisions and of the commonly known fact that nearly all of the large food processing or manufacturing concerns are dependent upon municipal water supplies."

With respect to the question as to whether the summary-judgment statute is applicable, we are of the opinion that upon the record as it is before the court, the proceedings under sec. 270.635, Stats., were properly applicable. The affidavits state evidentiary facts, *Schau v. Morgan,* 241 Wis. 334, 6 N. W. (2d) 212, and the court properly decided the question of the constitutionality of the resolution in determining the case. *Werner v. Milwaukee Solvay Coke Co.* 252 Wis. 392, 31 N. W. (2d) 605. The issues presented by the pleading and affidavits are legal rather than factual, and the power involved is the general police power. It appears from the record that all of the proceedings and the principal and controlling issues were properly determined. Both sides asked for summary judgment. The evidence warranting the determination of the court is such that the objections on the part of the appellants were properly overruled in denying their complaint. The judgment below must be upheld.

*By the Court.*—Judgment affirmed.