MINNESOTA BOARD OF HEALTH, BY DR. WARREN R. LAWSON, v. CITY OF BRAINERD AND OTHERS.*

241 N. W. 2d 624.

March 26, 1976—No. 45644.

---

*Appeal dismissed, 429 U. S. 803, 97 S. Ct. 35, 50 L. ed. 2d 63 (1976).

*John Remington Graham* and *D. A. Larson,* City Attorney, for appellants.

*Warren Spannaus,* Attorney General, *Peter W. Sipkins,* Solicitor General, *Richard G. Mark,* Assistant Solicitor General, and *Richard A. Wexler,* Special Assistant Attorney General, for respondent.

MacLaughlin, Justice.

The issue on this appeal is whether the appellant city of Brainerd must fluoridate its municipal water supply in compliance with Minn. St. 144.145. The trial court rejected appellants' arguments that the statute is unconstitutional and issued a peremptory writ of mandamus commanding Brainerd to comply with the law. We affirm.

In 1967, the Minnesota Legislature enacted what is commonly referred to as the Minnesota Fluoridation Law, Minn. St. 144.145. The statute required that prior to January 1, 1970,—

"* * * the person, firm, corporation, or municipality having jurisdiction over a municipal water supply, whether publicly or privately owned or operated, shall control the quantities of fluoride in the water so as to maintain a fluoride content prescribed by the state board of health."

In 1969, the Minnesota State Board of Health adopted regulations which require that the fluoride content of municipal water supplies be maintained at an average concentration of 1.2 milligrams per liter. Minn. Reg. 1969 MHD 112(b) (now Minn. Reg. MHD 138).

In 1972, Minnesotans Opposed to Forced Fluoridation (MOFF), a private nonprofit corporation, sought an injunction against enforcement of the fluoridation statute in the city of Brainerd. The city of Brainerd and the Minnesota State Board of Health were named as defendants. In that action the trial court found the fluoridation law to be a valid exercise of legislative authority which did not violate the constitutional rights of the citizens of the state nor constitute pollution within the meaning of the Environmental Rights Act. The court therefore denied the injunction and no appeal was taken.

After this decision, the Minnesota State Board of Health attempted to persuade Brainerd to fluoridate its water. During this time the city of Brainerd held a special referendum which resulted in a vote of 1,863 to 199 against fluoridation and a vote of 1,697 to 325 in favor of holding a "convention of the people"

to "deliberate on the constitutionality of forced fluoridation." The total membership of the "convention of the people" was the mayor, members of the city council, and members of the water and light board of the city of Brainerd. On July 5, 1974, this convention declared § 144.145 and Minn. Reg. 1969 MHD 112(b) to be an unconstitutional invasion of individual rights.

On September 5, 1974, the State Board of Health filed a petition for a writ of mandamus after a previous petition was dismissed for insufficient pleading. Appellants answered the petition, and respondent moved for judgment on the pleadings. On December 5, 1974, the trial court issued a peremptory writ of mandamus. In its memorandum the trial court concluded that appellants were barred by the judgment in the MOFF proceeding from relitigating the validity of the fluoridation law. The trial court further found that the fluoridation law was not nullified by the Brainerd convention, that the city was not entitled to an administrative hearing prior to fluoridation, and that mandamus was the proper remedy to compel Brainerd to comply with the law. The city of Brainerd and its officials appeal this decision.

■    The major issue raised on this appeal is whether the Minnesota Fluoridation Law is constitutional. However, respondent first questions whether the city of Brainerd may properly raise such a challenge. Respondent contends that Brainerd is barred under the doctrine of res judicata from bringing this action since Brainerd was a party in MOFF v. City of Brainerd and Minnesota State Board of Health, in which the constitutionality of the fluoridation law was upheld. In that case, MOFF sought an injunction against the fluoridation of Brainerd's water supply naming the city of Brainerd as one of the defendants in the action. The trial court denied the injunction, and no appeal was taken. In the current action, the State Board of Health seeks a writ of mandamus to compel the city of Brainerd to fluoridate its water supply pursuant to the statute and regulation. The trial court concluded that Brainerd may not now oppose the fluoridation since it had the "opportunity and * * * incentive" to voice

any objection it had in the MOFF proceedings; and even though it failed to do so, it is nevertheless bound by that judgment.

We have observed that res judicata—

"* * * operates as an absolute bar to a subsequent suit on the same cause of action, concluding the parties and their privies not only as to every matter that was litigated but also as to any other claim or defense which might have been litigated." Howe v. Nelson, 271 Minn. 296, 301, 135 N. W. 2d 687, 691 (1965).

This rule is based upon "considerations of public policy which demand an end to litigation where a party has had a full, free, and untrammeled opportunity to present facts pertinent to a decisive issue." Lustik v. Rankila, 269 Minn. 515, 520, 131 N. W. 2d 741, 745 (1964).

Although it is a close question, we conclude that Brainerd did not have such an opportunity. It must be remembered that Brainerd was merely a nominal party in the first action and appeared solely in its capacity as proprietor of the water supply. Since the first trial, the referendum by the people of Brainerd has activated the city's duty to affirmatively represent the will of its citizens. Had the referendum occurred prior to the time of the first action, Brainerd would certainly have actively taken part in support of MOFF's position for an injunction against compulsory fluoridation of its water supply. While the question is not free from doubt, we have decided, because of the obvious public purpose to be served by a decision of this case on its merits, that Brainerd is not barred by the doctrine of res judicata. [1]

---

[1] Respondent also asserts that appellants' challenge is barred by the doctrine of estoppel by inconsistent position. However, the doctrine of estoppel by inconsistent position does not apply to the facts of this case. The rule prohibiting the shifting of position "rests largely upon the principle that it results in prejudice to the party who acquiesces in the position first taken." Friend v. Friend, 158 Minn. 31, 38, 196 N. W. 814, 817 (1924). See, also, Behrens v. Kruse, 121 Minn. 90, 98, 140 N. W. 339, 342 (1913). In addition, allowing a party to shift position may also mis-

■ Respondent also argues that appellant city of Brainerd, as a public body acting through public officials, is without standing to challenge the constitutionality of the fluoridation statute. In State ex rel. Clinton Falls Nursery Co. v. County of Steele, 181 Minn. 427, 430, 232 N. W. 737, 738 (1930), we stated:

"* * * The better doctrine supported by the weight of authority is that [a public] official so charged with the performance of a ministerial duty will not be allowed to question the constitutionality of such a law. * * * Officials acting ministerially are not clothed with judicial authority. To permit them to refuse to perform their duty on the ground that the commanding law is unconstitutional would be a dangerous practice in that they who have only ministerial duties would be raising questions affecting the rights of third persons while they themselves would have no direct interest in the question and could not in any event be made responsible."

However, we added (181 Minn. 431, 232 N. W. 738):

"There is found among the authorities a well recognized exception to the foregoing rule when the rights of the state or the public interest are involved."

See, also, Elwell v. County of Hennepin, 301 Minn. 63, 221 N. W. 2d 538 (1974).

In Commr. of Taxation v. Crow Wing County, 275 Minn. 9,

---

lead the court. Friend v. Friend, *supra*. As this court concluded in Moquist v. Chapel, 62 Minn. 258, 260, 64 N. W. 567, 568 (1895), "[h]aving submitted his case upon one theory of the law and facts, a party cannot complain if it is correctly decided according to that theory, or be afterwards heard to say, if some other theory had been presented, it should have been decided differently."

Thus, the doctrine is primarily concerned with ensuring fair trial tactics within a single litigation. In any case, respondent has not even attempted to show how it has been led to change its position for the worse by any act of appellants or how the court has been misled. In sum, the doctrine of estoppel by inconsistent position is simply not applicable to the instant case.

13, 144 N. W. 2d 717, 719 (1966), we recognized a second exception:

"* * * In our view the interest required to give standing to a political subdivision must be one predicated upon some adverse effect upon the governmental unit."

See, also, Village of Burnsville v. Onischuk, 301 Minn. 137, 222 N. W. 2d 523 (1974).

We hold that the city of Brainerd has standing to challenge the constitutionality of the fluoridation law under either of the above two exceptions. First, the question of fluoridating the drinking water of Brainerd involves a question of substantial public interest to the people of Brainerd. In view of Brainerd's overall responsibility for providing safe and satisfactory water to its citizens, it is proper that the city have standing to challenge the statute in the public interest. Second, it is alleged by Brainerd that the fluoridation statute has a specific adverse effect upon the city of Brainerd in that it threatens to destroy the city's water filtration system. Thus, Brainerd, in its capacity as proprietor of the water supply, has a very specific and concrete interest in challenging the validity of the statute. Finally, it must be remembered that the standing doctrine is primarily designed to guarantee that there is a sufficient case or controversy between the parties so that the issue is properly and competently presented to the court. It is clear that appellants have vigorously and competently presented the issue to this court. Consequently, "[a]t this stage of the litigation it would be a great disservice to the public to decline jurisdiction because the [appellants'] standing is somewhat doubtful." Village of Burnsville v. Onischuk, 301 Minn. 137, 143, 222 N. W. 2d 523, 527.

■ Before considering appellants' arguments concerning the constitutionality of fluoridation, it is important to understand the factual background of fluoridation. For this purpose we quote at length from the trial court's memorandum in MOFF v. City of Brainerd and Minnesota State Board of Health:

"Fluoride, the substance in question, is the ion of the element fluorine. It is never found in nature in an isolated form but always in association with other elements, most commonly with calcium. Fluoride is found in all minerals, rocks and soil; it is present in all foods and water consumed by human beings. The addition of fluoride to drinking water, at least in the amounts here contemplated, affects neither the color nor the taste of the water. Fluoride, in common with many other substances such as oxygen, ordinary table salt, vitamin A and vitamin B is toxic when ingested in relatively large amounts. The natural drinking waters of this country vary in fluoride content from a barely discernible trace up to about 15 milligrams per liter or, as it is otherwise expressed, up to about 15 parts per million (ppm). * * *

"In an effort to determine the cause of mottled enamel observed on the teeth of children and adults in certain communities, studies were begun about 70 years ago which ultimately established that an excessive amount of natural fluoride in the drinking water consumed by the residents of said communities caused such mottling, thereafter described as dental fluorosis. During the course of these studies it was observed that these mottled teeth, while cosmetically undesirable in some instances, were otherwise sound and were less susceptible to decay. Without detailing the various studies made, it can be said that by 1945 there was good cause to believe that the addition of fluoride in an amount varying from 1 to 1.5 ppm to water supplies being consumed by children would serve to reduce the incidence of dental decay in said children without serious cosmetic effects by reason of dental fluorosis. Beginning in 1945 and continuing to date municipalities and states have been acting to fluoridate municipal water supplies by the addition of fluoride in amounts up to 1.5 ppm. The studies which were begun in the 1930's to determine the effect of fluoride on teeth have continued to date and have established beyond any serious question that persons who use waters containing 1.0 to 1.5 ppm of fluoride, either naturally or

artificially, from infancy to the age of 10 or 12 years have significantly fewer dental caries in their permanent teeth and without dental fluorosis to an unacceptable degree.

"This widespread acceptance of fluoridation as an effective means to prevent dental caries has led to the controlled fluoridation of the water supplies in over 4,800 communities in the United States and these communities include most of the large cities in the nation. There are presently about 100 million people in this country consuming water having a fluoride content between .7 ppm and 1.5 ppm. In Minnesota over 90% of the more than 650 communities having a municipal water supply have fluoridated the same. * * * A substantial majority of the citizens of this state presently drink fluoridated water and most of this majority have been doing so for more than 15 years.

"Fluoridation of public water supplies has been advocated or recommended by more than forty national professional and scientific organizations including the American Medical Association, American Dental Association, American Institute of Nutrition, American Association for the Advancement of Science, American Association of Dental Schools, American Cancer Society and many others of like standing and repute. Fluoridation now has and for many years has had the enthusiastic endorsement and support of the U. S. Public Health Service."

At least in part because of this endorsement by the scientific community, the Minnesota Legislature enacted Minn. St. 144.145 requiring the fluoridation of all public water supplies. Appellants argue, though, that fluoridation presents a serious health hazard and calls to our attention certain scientific studies which indicate the dangers of fluoridation. However, it is not this court's function, at least in the absence of overwhelming evidence to the contrary, to second-guess the scientific accuracy of a legislative determination of fact. Nor is it within our province to determine the wisdom of or necessity for a legislative enactment. As we said in Beck v. Groe, 245 Minn. 28, 40, 70 N. W. 2d 886, 895 (1955):

"The legislature is in the first instance the judge of what is

necessary for the public welfare. The earnest conflict of serious opinion does not suffice to bring it within the range of judicial cognizance. Courts cannot pass on the soundness or expediency of theories embodied in statutes enacted in the exercise of the police power for the social benefit of the citizen and the public welfare. The control, regulation, and restrictions to be imposed, to attain, so far as may be, results consistent with the public welfare, are purely of legislative cognizance. The legislative determination of the control to be applied is final, except when so arbitrary as to be violative of the constitutional rights of the citizen."

In enacting the fluoridation law, the legislature relied on the overwhelming weight of scientific opinion that fluoridation afforded a safe and effective means of reducing dental caries. We cannot say that this legislative determination is so clearly erroneous as to be arbitrary and violative of due process. State v. Edwards, 287 Minn. 83, 87, 177 N. W. 2d 40, 43 (1970). In fact, the state courts have been unanimous in holding fluoridation to be a proper exercise of the state's police power. See, Graybeal v. McNevin, 439 S. W. 2d 323 (Ky. 1969); Opinion of the Justices, 243 A. 2d 716 (Del. 1968); Attaya v. Town of Gonzales, 192 So. 2d 188 (Ct. App. La. 1966); Paduano v. City of New York, 45 Misc. 2d 718, 257 N. Y. S. 2d 531, affirmed, 24 App. Div. 2d 437, 260 N. Y. S. 2d 831 (1965), affirmed, 17 N. Y. 2d 875, 271 N. Y. S. 2d 305, 218 N. E. 2d 339 (1966), certiorari denied, 385 U. S. 1026, 87 S. Ct. 754, 17 L. ed. 2d 674 (1967); Hall v. Bates, 247 S. C. 511, 148 S. E. 2d 345 (1966); Wilson v. City of Mountlake Terrace, 69 Wash. 2d 148, 417 P. 2d 632 (1966); Rogowski v. City of Detroit, 374 Mich. 408, 132 N. W. 2d 16 (1965); Schuringa v. City of Chicago, 30 Ill. 2d 504, 198 N. E. 2d 326 (1964), certiorari denied, 379 U. S. 964, 85 S. Ct. 655, 13 L. ed. 2d 558 (1965); Stroupe v. Eller, 262 N. C. 573, 138 S. E. 2d 240 (1964); City Commission of Fort Pierce v. State ex rel. Altenhoff, 143 So. 2d 879 (Ct. App. Fla. 1962), appeal dismissed, 154 So. 2d 208 (Ct. App. Fla. 1963); Wilson v. City of Council

Bluffs, 253 Iowa 162, 110 N. W. 2d 569 (1961); Readey v. St. Louis County Water Co. 352 S. W. 2d 622 (Mo. 1961), appeal dismissed, 371 U. S. 8, 83 S. Ct. 20, 9 L. ed. 2d 47 (1962); Birnel v. Town of Fircrest, 53 Wash. 2d 830, 335 P. 2d 819 (1959), appeal dismissed, 361 U. S. 10, 80 S. Ct. 71, 4 L. ed. 2d 51 (1959); Teeter v. Municipal City of LaPorte, 236 Ind. 146, 139 N. E. 2d 158 (1956); Baer v. City of Bend, 206 Ore. 221, 292 P. 2d 134 (1956); Kraus v. City of Cleveland, 163 Ohio St. 559, 127 N. E. 2d 609 (1955), appeal dismissed, 351 U. S. 935, 76 S. Ct. 833, 100 L. ed. 1463 (1956); Kaul v. City of Chehalis, 45 Wash. 2d 616, 277 P. 2d 352 (1955); Froncek v. City of Milwaukee, 269 Wis. 276, 69 N. W. 2d 242 (1955); Chapman v. City of Shreveport, 225 La. 859, 74 So. 2d 142 (1954), appeal dismissed, 348 U. S. 892, 75 S. Ct. 216, 99 L. ed. 701 (1954); DeAryan v. Butler, 119 Cal. App. 2d 674, 260 P. 2d 98 (1953), certiorari denied, 347 U. S. 1012, 74 S. Ct. 863, 98 L. ed. 1135 (1954); Dowell v. City of Tulsa, 273 P. 2d 859, 43 A. L. R. 2d 445 (Okla. 1954), certiorari denied, 348 U. S. 912, 75 S. Ct. 292, 99 L. ed. 715 (1955). Therefore, for purposes of this decision, we must accept as factual the legislative determination that fluoride is a safe and effective means of reducing dental caries.

Appellants proceed to argue, however, that "the question is not whether fluoridation may be good, but whether the people have a constitutional prerogative to refuse." (Italics omitted.) Appellants contend that there is such a prerogative which derives from the constitutional right of privacy. [2]

While the constitution does not explicitly mention any right of privacy, the United States Supreme Court has recognized, in varying contexts, a constitutional right of personal privacy. This

---

[2] Appellants also argue that Brainerd itself has a constitutional right to community privacy. Appellants, however, have not cited for us any authority to support the proposition that a community has a constitutional right of privacy. Whatever privacy rights Brainerd has in this matter must derive from the individual constitutional rights of its citizens.

right of privacy has been found in the First Amendment (Stanley v. Georgia, 394 U. S. 557, 564, 89 S. Ct. 1243, 1247, 22 L. ed. 2d 542, 549 [1969]); in the Fourth and Fifth Amendments (Terry v. Ohio, 392 U. S. 1, 8, 88 S. Ct. 1868, 1873, 20 L. ed. 2d 889, 898 [1968]; Katz v. United States, 389 U. S. 347, 350, 88 S. Ct. 507, 510, 19 L. ed. 2d 576, 581 [1967]; and Boyd v. United States, 116 U. S. 616, 6 S. Ct. 524, 29 L. ed. 746 [1886]); in the penumbras of the Bill of Rights (Griswold v. Connecticut, 381 U. S. 479, 484, 85 S. Ct. 1678, 1681, 14 L. ed. 2d 510, 514 [1965]); in the Ninth Amendment, (Griswold v. Connecticut, 381 U. S. 479, 486, 85 S. Ct. 1678, 1682, 14 L. ed. 2d 510, 516 [Goldberg, J., concurring]); and in the concept of liberty guaranteed by the Fourteenth Amendment (Meyer v. Nebraska, 262 U. S. 390, 399, 43 S. Ct. 625, 626, 67 L. ed. 1042, 1045 [1923]). In Roe v. Wade, 410 U. S. 113, 152, 93 S. Ct. 705, 726, 35 L. ed. 2d 147, 176 (1973), the Supreme Court concluded:

"* * * These decisions make it clear that only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty,' *Palko v. Connecticut,* 302 U. S. 319, 325 (1937), are included in this guarantee of personal privacy."

At the core of the privacy decisions, in our judgment, is the concept of personal autonomy—the notion that the constitution reserves to the individual, free of governmental intrusion, certain fundamental personal decisions about how he or she will conduct his or her life. See, Price v. Sheppard, 307 Minn. 250, 239 N. W. 2d 905 (1976). Thus, in Eisenstadt v. Baird, 405 U. S. 438, 453, 92 S. Ct. 1029, 1038, 31 L. ed. 2d 349, 362 (1972), the Supreme Court held that the right of privacy protects an individual's right "to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child"; and, in Roe v. Wade, *supra,* the court held that the right of privacy protects an individual's right to decide "whether or not to terminate her pregnancy." 410 U. S. 153, 93 S. Ct. 727, 35 L. ed. 2d 177.

While the United States Supreme Court has never so held, the

right of personal privacy could also extend to protect an individual's decision regarding what he will or will not ingest into his body. Indeed, this concept of bodily integrity is rooted in common law. As the Supreme Court stated in Union Pacific Ry. Co. v. Botsford, 141 U. S. 250, 251, 11 S. Ct. 1000, 1001, 35 L. ed. 734, 737 (1891):

"No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law."

Whether one's right to bodily integrity is designated a right of personal privacy or not, though, does not alter our conclusion that the right, like other constitutional rights, is not absolute. As the Supreme Court held in Roe v. Wade (410 U. S. 154, 93 S. Ct. 727, 35 L. ed. 2d 177):

"We, therefore, conclude that the right of personal privacy includes the abortion decision, but that this right is not unqualified and must be considered against important state interests in regulation."

And in specific reference to an individual's right of bodily integrity, the court stated in Breithaupt v. Abram, 352 U. S. 432, 439, 77 S. Ct. 408, 412, 1 L. ed. 2d 448, 453 (1957):

"As against the right of an individual that his person be held inviolable * * * must be set the interests of society * * *."

Thus, in Schmerber v. California, 384 U. S. 757, 768, 86 S. Ct. 1826, 1834, 16 L. ed. 2d 908, 918 (1966), a case involving a governmental intrusion into an individual's body for blood to be analyzed for alcohol content, the Supreme Court concluded that the constitution does not protect an individual "against all intrusions" but only "against intrusions which are not justified in the circumstances, or which are made in an improper manner."

Therefore, to properly determine the constitutionality of

fluoridation, we must consider (1) the importance of the state's purpose for requiring fluoridation; (2) the nature and magnitude of the effect of forced fluoridation on the individual; (3) whether the state's purpose justifies the intrusion of forced fluoridation; and (4) whether the means adopted by the state to accomplish its purpose is proper and reasonable.

It seems clear that the state has a substantial interest in fluoridating the public drinking water to prevent tooth decay.

"Although not a contagious disease, dental caries, or tooth decay, presently constitutes one of the most challenging health problems in the United States. By the time they reach adulthood, some ninety-nine percent of the American population has had some experience with dental caries. Half of the population over fifty-five have no natural teeth at all. Compounding this problem of dental health is the great shortage of dentists, dental hygienists, and dental assistants. It has been estimated that approximately one-third of the population sees a dentist annually, and eighteen percent has never seen a dentist. A billion dental manhours would have been required in 1962 just to handle the then current backlog of dental problems. The dental manpower currently available cannot physically provide for more than half of the existing dental needs." Farrer, *Fluoridation: Compulsory Medication of Municipal Water Supplies?* 5 Urban Lawyer 504. [3]

Aside from this enormous drain on health facilities, the state has a direct interest in maintaining public health. The health of one's children[4] is not exclusively a personal or individual concern. The Supreme Court of Louisiana stated:

"The health of the children of a community is of vital interest and of grave importance to all the inhabitants of the community.

---

[3] See, also, Clark & Sophy, *Fluoridation: The Courts and the Opposition,* 13 Wayne L. Rev. 338 (1966).

[4] Fluoridation has its most beneficial effect upon individuals who have consumed fluoridated water from infancy to the age of 10 or 12 years. See, the excerpt from the trial court's memorandum in MOFF v. City of Brainerd and Minnesota State Board of Health, quoted above.

38

Their health and physical well-being is of great concern to all the people, and any legislation to retard or to reduce disease in their midst cannot and should not be opposed on the ground that it has no reasonable relation to the general health and welfare." Chapman v. City of Shreveport, 225 La. 859, 870, 74 So. 2d 142, 145, appeal dismissed, 348 U. S. 892, 75 S. Ct. 216, 99 L. ed. 701 (1954).

We next consider the nature and magnitude of the effect of fluoridation on the individual. While forced fluoridation does intrude on an individual's decision whether or not to ingest fluoride, the impact of this intrusion on an individual's life is negligible. This becomes particularly evident when compared to the impact involved in the Supreme Court's privacy decisions such as in Griswold v. Connecticut, 381 U. S. 479, 85 S. Ct. 1678, 14 L. ed. 2d 510; Eisenstadt v. Baird, 405 U. S. 438, 92 S. Ct. 1029, 31 L. ed. 2d 349, and Roe v. Wade, 410 U. S. 113, 93 S. Ct. 705, 35 L. ed. 2d 147, where the state's intrusion had the impact of depriving the individual of his or her freedom to decide whether or not to have children. While forced fluoridation does, to a limited extent, infringe upon an individual's freedom to decide whether he will or will not ingest fluoride, such an infringement, absent any significant adverse consequences to the individual, cannot be accorded substantial weight. The difficulty with according weight to such a prerogative in a case of this type is that if fully recognized it would confer upon the individual the prerogative to refuse to allow the government to chlorinate the water or to take similar actions which it has determined to be in the best interests of public health. Such an unbalanced allocation of decision-making authority is unacceptable. In Roe v. Wade, 410 U. S. 113, 154, 93 S. Ct. 705, 727, 35 L. ed. 2d 147, 177, the Supreme Court indicated that it has consistently "refused to recognize an unlimited right [to do with one's body as one pleases]."

Appellants contend that the intrusion is not justified based on Jacobson v. Massachusetts, 197 U. S. 11, 25 S. Ct. 358, 49 L. ed. 643 (1905), in which the United States Supreme Court upheld

compulsory vaccination in the face of a threatened smallpox epidemic as a valid exercise of police power. Appellants insist that compulsory medication, that is, intrusion into an individual's bodily integrity, was allowed in Jacobson only because of the great danger to the public welfare posed by the contagious disease of smallpox. We note, however, that the court in Jacobson, quoting Crowley v. Christensen, 137 U. S. 86, 89, 11 S. Ct. 13, 15, 34 L. ed. 620, 621 (1890), stated the governing principle in broad terms (197 U. S. 26, 25 S. Ct. 361, 49 L. ed. 650):

" '* * * The possession and enjoyment of all rights are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community.' "

Upon balancing the substantial public health benefit of fluoridation against its innocuous effect on the individual, we have concluded that fluoridation is a justified intrusion into an individual's bodily integrity. As the Illinois Supreme Court stated in Schuringa v. City of Chicago, 30 Ill. 2d 504, 518, 198 N. E. 2d 326, 334 (1964):

"'* * * [F]luoridation programs, even if considered to be medication in the true sense of the word, are so necessarily and reasonably related to the common good that the rights of the individual must give way."

Finally, we must determine whether the means of achieving the state's purpose is proper and reasonable. After careful consideration, we have concluded that the means adopted by the state to accomplish its purpose in the instant case is not particularly offensive or unusual. Although the actual consumption of water is, in a sense, a private and personal act, the preparation and treatment of that water is a common and accepted public function. In fact, there are numerous governmental regulations controlling the ingredients in the food we eat. Such quality-control measures are inherent in a technologically advanced society and do not ordinarily affront a person's sensibilities.

40

The public health of all the state's citizens, involving as it does a social condition, is a distinctly legislative concern. The Minnesota Legislature has determined that the health, welfare, and safety of the public is best served by providing fluoride through the public drinking water. While we have great respect for the strong and sincerely held opinion of many of the citizens of Brainerd,[5] we reiterate that it is not this court's function, absent a clear violation of constitutional rights, to reconsider the wisdom or necessity of a legislative decision. Therefore, after careful consideration, we find the Minnesota Fluoridation Law, Minn. St. 144.145, to be constitutional.

■ Appellant city finally argues that it is entitled to an administrative due process hearing before it can be required to fluoridate its water supply. The purpose of such a hearing would be to determine the effect of fluoridation on Brainerd's water filtration system. Appellant has alleged that fluoridation would upset the delicate chemical balance of its unique filtration system and cause a dangerous accumulation of sludge in the city's pipes. However, the fact that fluoridation would require the city of Brainerd to incur expense in remedying, or even replacing, its

[5] While we agree that Brainerd's "constitutional convention" was an eloquent way for the people of Brainerd to express their feelings on the subject of fluoridation, we do not recognize the resolutions of that convention as binding authority on the constitutionality of the fluoridation law. Authority to determine the constitutionality of laws resides in the judiciary. As the United States Supreme Court recently stated in United States v. Nixon, 418 U. S. 683, 703, 94 S. Ct. 3090, 3105, 41 L. ed. 2d 1039, 1061 (1974): "* * * Many decisions of this Court * * * have unequivocally reaffirmed the holding of *Marbury v. Madison* * * * that '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" This is an indispensable feature of our constitutional system. To the extent that appellants' claim urges that final authority to interpret the law does not reside with the courts, it must be rejected. "* * * To yield to such a claim would be to enthrone official lawlessness, and lawlessness if not checked is the precursor of anarchy." Cooper v. Aaron, 358 U. S. 1, 22, 78 S. Ct. 1401, 1412, 3 L. ed. 2d 19, 20 (1958).

present filtration system does not afford it a constitutional right to a due process hearing. As a governmental subdivision, the city of Brainerd is not a "person" for purposes of the due process clause and therefore has no constitutional right to a due process hearing before being deprived of property. Independent School Dist. No. 581 v. Mattheis, 275 Minn. 383, 147 N. W. 2d 374 (1966) ; see, also, Waters v. Putnam, 289 Minn. 165, 183 N. W. 2d 545 (1971). This is because a "municipal corporation is, so far as its purely municipal relations are concerned, simply an agency of the state for conducting the affairs of government, and as such it is subject to the control of the legislature." Williams v. Eggleston, 170 U. S. 304, 310, 18 S. Ct. 617, 619, 42 L. ed. 1047, 1049 (1898).

The order of the trial court is affirmed.

YETKA, JUSTICE (dissenting).

I dissent. To me it is essential to bear in mind that, unlike the vaccination cases, we are not asked to decide the constitutionality of a law which *directly* imposes fluoridation on an unwilling individual. Rather, Minn. St. 144.145 does so only *indirectly* by requiring municipalities to fluoridate their water supplies for the purpose of making available publicly-funded fluoride treatment. Presumably those opposed to fluoridation are free to obtain nonfluoridated water from other sources, however impractical and unlikely that may be. Moreover, the law, by its terms falls short of reaching a large number of our population who draw their water from private wells. Undoubtedly were the law otherwise, e. g., compulsory periodic dental application of fluoride for all children, the decision reached by the majority would have been arrived at with greater difficulty.

Equally important, in my judgment, is the distinction between the chlorination of a public water supply and fluoridation. The purpose of the former is to ensure the safety of a water supply for public consumption; the purpose of the latter is to treat individual dental health problems.

The majority concedes that a substantial constitutional right is involved, but that the state's intrusion or infringement upon that right is justified when its interest is balanced against that of the individual. It was my understanding in Price v. Sheppard, 307 Minn. 250, 239 N. W. 2d 905 (1976), cited in the majority opinion, that even if the state's intrusion is justified, it is not unlimited. In addition "[i]t must appear that the means utilized to serve the state's interest are necessary and reasonable, or in other words, in light of alternative means, the least intrusive." 307 Minn. 257, 239 N. W. 2d 910. I assume this is also what the majority has in mind in assessing the reasonableness of the means chosen by the legislature in enacting Minn. St. 144.145.

Contrary to the conclusion of the majority, it seems to me that in the city of Brainerd, where an overwhelming majority of those participating in a voter referendum indicated their opposition to fluoridation, less intrusive means could and should have been utilized. In fact, the infringement of the rights of the majority could have been avoided altogether. The state's purpose was to make available publicly-funded fluoride treatment, not to impose it directly on individuals. It chose what it obviously considered to be the most efficient means. But it could have achieved that same purpose by compelling the city to furnish fluorine tablets or dental application to those who wished it, without infringing on the rights of the majority. Moreover, it is my understanding from the record that Brainerd is willing to provide fluoride in such an alternative fashion to those who wish it.

Moreover, it must be remembered that while fluoridating a water supply may be an efficient means of achieving the state's purpose, it is apparently not the most economical method in Brainerd. Carl Zapffe, Ph. D., a scientist specializing in chemistry, physics and metallurgical engineering, averred in an affidavit that there was a "strong likelihood" that the "complicated and delicate chemical balance" in the Brainerd water filtration system "due to the excessive presence of manganese and iron

oxides dissolved in the natural water" could be destroyed by the addition of fluoride in the amounts proposed by the state.

There has also been some evidence presented in the case that fluorine might be a carcinogen. I must say that the evidence presented was very weak and could have been more decisive in this case, but this court ought to take judicial notice of the fact that scientists are finding every day that additives, chemical and otherwise, of all sorts are seriously suspect in the rising rate of cancer in the United States. When there is not a showing of a great overriding state interest and fluorine is readily available for those who want it by other means, why shouldn't the wishes and the rights of the local citizens, whether individually or as a group, be respected and be paramount?

There must be a point at which state action must yield to the asserted rights of the individual. I believe that this point has clearly been reached in this case. Central to our notion of democracy is the respect for the rights and wishes of the majority. Here the infringement of the majority's rights can be avoided without defeating the legislative purpose of the Minnesota Fluoridation Law.

For these reasons I must respectfully dissent.

MR. JUSTICE OTIS took no part in the consideration or decision of this case.